Benjamin ALCINDORE, Appellant,

v.

UNITED STATES, Appellee.

No. 00–CF–1459.

District of Columbia Court of Appeals.

Argued Oct. 16, 2002.

Decided March 6, 2003.

Jon W. Norris, Washington, DC, for appellant.

David B. Goodhand, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney, and John R. Fisher, Mary Patrice Brown, and Barbara E. Kittay, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB and REID, Associate Judges.

WAGNER, Chief J.

Appellant, Benjamin Alcindore, was indicted on five counts: (1) assault with in-

tent to kill while armed (AWIK/WA) (D.C.Code §§ 22–501 [1], –3202 [2]), (2) aggravated assault while armed (D.C.Code §§ 22–504.1 [3], –3202), (3) mayhem while armed (D.C.Code §§ 22–506 [4], –3202), (4) possession of a firearm during a crime of violence or dangerous offense (PFCV) (D.C.Code § 22–3204(b)), and (5) carrying a pistol without a license (CPWL) (D.C.Code § 22–3204(a)).[5] A jury found him not guilty of AWIK/WA, but guilty of the lesser-included offense of assault with a dangerous weapon (ADW), and of the remaining charges. Alcindore argues for reversal on the grounds that the trial court erred in: (1) declining to re-instruct the jury in response to a jury note; (2) accepting a verdict inconsistent with the jury instructions with respect to the elements of the charged offenses; (3) overruling objections to improper argument by the prosecutor; and (4) singling him out as a witness having a vital interest in the outcome of the trial. We hold that under the circumstances of this case, the trial court erred in declining to re-instruct, upon defense request, where a jury note submitted before the verdict was taken in open court, demonstrated jury confusion as to the claim of self-defense. Therefore, we reverse and remand for a new trial on all counts for which he was convicted, except for the CPWL count.

## I.

### A. *Evidence Presented by the Government*

The charges arose out of events which occurred on the morning of December 22, 1999 on the campus of Georgetown University. The complaining witness, Kenneth Ames, Jr., who worked for the university, testified that he was driving to his parking space when he noticed a vehicle close behind his. Ames testified that the driver of that vehicle, later identified as Alcindore, flashed his lights, honked his horn and made gestures at him. According to Ames, he came to a crosswalk, and Alcindore started to go around him, but Ames pulled out, blocked him and stopped to allow a student to pass. Afterwards, Alcindore pulled around him, yelled and gave him the middle finger. Ames followed Alcindore, and Alcindore stopped his taxicab. Ames then went up to Alcindore's cab and said to him, "I don't know if you saw the student back there, but you know it's a good possibility that you could have hit that student." Alcindore asked, "who the hell are you?" During the ensuing argument, both men raised their voices and cursed at each other. Ames admonished Alcindore that the speed limit was fifteen miles an hour and that he could not drive like that on campus. Ames told Alcindore that he "could just write down [his] cab number and make sure [he] don't get on campus no more." Ames then noticed a "bunch of tags" clipped on Alcindore's visor, reached in to take them and told Alcindore that he could write the numbers down and call his cab company. Ames testified that Alcindore slapped his hand away, but he put it back, and the two continued their argument. Ames testified that he finally leaned into Alcindore's car

1. Section 22–501 (1981) has been recodified as § 22–401 (2001).

2. Section 22–3202 (1981) has been recodified as § 22–4502 (2001).

3. Section 22–504.1 (1981) has been recodified as § 22–404.01 (2001).

4. Section 22–506 (1981) has been recodified as § 22–406 (2001).

5. Section 22–3204 (1981) has been recodified as § 22–4504 (2001).

and said "whatever ... just please slow down." When Ames tried to move away from the car, he discovered that his "feet wouldn't move," and he lost his balance and fell. As he fell to the ground, he realized that he had been shot. Ames said that as Alcindore drove away, he moved out of the way to avoid being hit. Ames testified that he did not threaten Alcindore in any way and that he had nothing in his hand when he approached Alcindore's car.

Meg Gardner, an employee at a campus bookstore, testified that she observed Ames leave his car and go over to the window of the cab. She testified that Ames was not carrying anything, but he appeared to be upset. She said that she observed Ames' "arm go into the window, or go through the window of the cab ...." Both men's arms were going back and forth through the window for about a minute, according to Gardner. She heard gunshots, but she was uncertain of what it was until she saw Ames fall. Ms. Gardner testified that it did not appear to her that the cab driver was in danger of death or that the circumstances required the use of deadly force.

Amy Stevens testified that she was walking to a building on campus that morning when Ames stopped for her at the crosswalk. She heard tires spinning, but she could not tell whether they were coming from Ames' truck or from Alcindore's cab. She testified that she saw Ames get out of his car, and she heard him yelling about the speed limit being fifteen miles per hour and a stop being required at the stop sign. She then heard three or four gunshots.

Both Charles Grimes, Jr. and Stephen Lamm testified that they saw Ames on the ground after the shooting, and they saw nothing around Ames that looked like a weapon. Grimes further testified that he did not see any weapon in Ames' clothing nor did he see any of his co-workers remove any such item from the scene.

## B. *Evidence Presented by the Defense*

Alcindore testified in his own behalf to the circumstances surrounding the shooting. He admitted shooting Ames, and explained that he did so because Ames jumped out of his vehicle, and attacked him "and he attacked a gun and that's why the gun went off and I guess he got shot." He testified that before the encounter, he was driving around campus looking for passengers. He denied making a gesture with his finger at Ames. He testified that Ames ran toward him with his hand in his pocket, pointing it, cursing and stating, "you want some of this." Alcindore described Ames as a "big, strong guy with big hands and kind of a big stomach and he was fuming. He was angry. I couldn't tell what was going on with him. It just looked like he was just crazy." Alcindore testified that Ames came to the car and said "you want to get killed, nigger" before jamming him with his left hand open on the right side of his mouth. He said that he "kicked back in the car to avoid that blow," and Ames hit him on the cheek bone with a closed fist. Alcindore testified that he "kicked back again and [Mr. Ames] went like this up side my head and grabbed me in the left hand in the throat and the right hand felt like—felt immediately the right hand clamping my neck and he started choking and squeezing and shaking my head and was still saying I'll kill you bitch ass, nigger, I'll kill you, nigger. I was horrified. I was—I couldn't understand what was going on." *Id.* Alcindore testified that he could not say anything because Ames choked him for almost thirty seconds to a minute. According to Alcindore, this led him to reach

> down underneath the mat where [he] kept the pistol in a towel and [he] pulled

up [his] pistol and that's when [he] felt an ease. [He] was able to ask him to back off. And [he] felt an ease immediately that same left hand came flying trying to grab the pistol. At that [he] came up with the pistol with the hammer cocked and the latch dropped. So when [appellant] tried to grab the pistol it was it was [sic] innocent reflex reaction then boom.

Alcindore admitted firing the gun twice. He explained that he obtained the weapon because he had been shot in 1993 in front of his home after parking his cab.[6]

Alcindore testified that after the shooting, he maneuvered his car around Ames and went to a friend's house first, but decided not to tell him of the shooting. He left after a minute or two, and placed the gun in a bag and threw it into a dumpster. He went home briefly and then traveled to New York to talk to a friend who is an attorney. When Alcindore learned that there was an outstanding warrant for his arrest, he returned to Washington, D.C. and turned himself in.

## II.

■ Alcindore argues that the trial court abused its discretion in failing to re-instruct the jury after receiving a note stating that it had reached a verdict, but including representations showing that its findings were inconsistent with the court's original instruction on self-defense. He contends that the note demonstrated on its face that the jury was confused about the law, thereby requiring an appropriate response from the court. The government responds that the trial court did not err in failing to re-instruct the jury because its

note did not reflect any confusion that required clarification.

■ In considering the parties' arguments, we are guided by several general principles which we outline briefly before beginning our analysis. In general, whether to re-instruct a jury is a decision left to the discretion of the trial court, and absent an abuse of discretion, its decision will not be reversed on appeal. *Whitaker v. United States,* 617 A.2d 499, 501 (D.C. 1992) (citing *Davis v. United States,* 510 A.2d 1051, 1052 (D.C.1986)). When the jury explains specific difficulties, the trial court "'should clear them away with concrete accuracy.'" *Id.* (quoting *Bollenbach v. United States,* 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946)). When a jury sends a note which demonstrates that it is confused, the trial court must not allow that confusion to persist; it must respond appropriately. *Id.* (citing *Murchison v. United States,* 486 A.2d 77, 83 (D.C.1984)) (other citations omitted). In this case, Alcindore contends that the jury's note demonstrated specific confusion and required a response. We are persuaded by his argument.

We outline first the context of the proceedings which led to the jury's note and the trial court's decision not to re-instruct them. Alcindore's defense to the charges, except for CPWL, was self-defense. Before the jury retired for deliberations, the trial court instructed the jury on self-defense, using essentially the language from the CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, (4th ed.1993), Nos. 5.12, 5.13, 5.14, and 5.15.[7] Briefly stated, these instructions informed the jury of a person's right to use a reasonable amount of force in self-de-

6. Alcindore also testified that a police officer told him that "he could not baby-sit [me] twenty-four hours a day so he suggested I go buy a gun."

7. We have reprinted the court's instructions, in pertinent part, in an appendix to this opinion.

fense if (1) "he actually believed that he is in imminent danger of bodily harm," and (2) "he has reasonable grounds to hold that belief." The court further instructed the jury on the circumstances under which a person may use deadly force, explaining in relevant part:

[a] person may use deadly force in self-defense if he actually and reasonably believes at the time of the incident that he is in imminent danger of death or imminent danger of serious bodily harm himself from which he can save himself only by using deadly force against the person he perceives is attacking him.... [E]ven if the defendant is justified in using force in self-defense ... he may not use any greater degree of force than he actually and reasonably believes to be necessary under the circumstances to prevent the harm that he reasonably believes is intended to save his life or to avoid his own serious bodily harm .... A person acting in the heat of passion

brought on by an assault does not necessarily lose his claim of self-defense by using greater force than might seem necessary to a calm mind.

After deliberating, the jury sent a note to the court which read:

[W]e would like to submit this note to you to explain that although we have found Mr. Alcindore guilty according to the language of Charges II, III, IV and lesser charge on I, we strongly believe that Mr. Alcindore never intended to harm Mr. Ames. We believe his use of force in defending himself was excessive; however, we do believe he felt he was defending himself.

A colloquy ensued between the court and defense counsel during which defense counsel argued that the jury's statement in the note was inconsistent with the verdict and that it appeared that the verdict was founded on an incorrect understanding of the law.[8] He requested that the court

---

8. After reading the note, defense counsel and the trial court engaged in the following colloquy:

DEFENSE COUNSEL: Your Honor, what course does the Court indicate taking now? I assume you anticipate taking a verdict. I would like to before we do that to have, I have just heard the note for the first time the record should reflect, and I would have liked obviously to know about it and comment on it and figure out because I'm concerned that that note is inconsistent with that indication of what the verdict is. And should not, if they say that we think that Mr. Alcindore felt he was acting in self-defense -
THE COURT: Right. That's what he actually believed. You know the test.
DEFENSE COUNSEL: I know.
THE COURT: So what? What do you mean what course am I going to take? I am going to take the verdict, they just told me what their verdict is.
DEFENSE COUNSEL: I think the Court, we should send back a clarifying note to the jury that says I've received your note and

want to ask you if you have said that you think he used, that you believe he acted in self-defense, do you believe that his belief was unreasonable or -
THE COURT: You think my jury instructions were not clear?
DEFENSE COUNSEL: No, I think your jury instructions were clear, but I think that
......
THE COURT: I think the note is clear.
DEFENSE COUNSEL: The area of the law—well, the note is clear by negative implication that they must have found that the belief was, belief was unreasonable. That's clearly what you would infer from that. But it doesn't say that.
And it says, it's a very—because of what it says, never intended to harm the person, and given my objections to some of [prosecution's closing] that measured the reasonableness of force and the impact on the person as opposed to the mental state of the defendant, I am concerned that the verdict is being founded on an incorrect understanding of the law.
I would rather say that now than say that later.

send a clarifying note to the jury inquiring whether the jury believed that Alcindore's belief that he was acting in self-defense was unreasonable. Defense counsel conceded in response to the court's question that the court's original instructions were clear. The court expressed the view that the note was clear also. However, defense counsel pointed out that the note was clear only by "negative implication" or inference that the jury must have found that the belief was unreasonable, but that the note did not say that. The trial court declined the request for re-instruction and took the jury's verdict.

Alcindore argues that the jury's express findings and verdict, as set forth in its note, are inconsistent and show that the jury was confused about the court's self-defense instructions. The government argues that the note reflects that the jury understood that to accept Alcindore's self-defense claim, it must conclude that he actually and reasonably believed that the amount of force used was necessary to defend himself. It reaches this conclusion because the jury stated in the note that Alcindore's "use of force in defending himself was excessive," followed by a statement that they "believe[d] he *felt* he was defending himself." Thus, the government argues, since the jury acknowledged in the note that Alcindore's belief was actual, and nevertheless rejected his self-defense claim, it necessarily must have concluded that his belief was unreasonable as the instructions stated.

There are at least two major flaws in the government's argument: first, the government supplies an explanation that the jury did not provide; and second, its interpretation of the note is not the only reasonable

one, thereby rendering its statement ambiguous, qualified and inconsistent. Here, the jury stated not only its belief that Alcindore felt that he was defending himself, but also that it strongly believed that Alcindore never intended to harm the victim. It is fair to interpret these declarations to mean that the jury concluded that, at least from Alcindore's perspective, he had to act as he did to defend himself and had no intention of harming the victim. Under our law, the actor's "subjective perceptions are the prime determinant of the right to use force—and the degree of force required—in self-defense, subject only to the constraints that those perceptions be reasonable under the circumstances." *Fersner v. United States,* 482 A.2d 387, 391–92 (D.C.1984). "Indeed, the victim's personal perceptions are so significant that they may justify the use of reasonable, including deadly, force in self-defense 'even though it may afterwards have turned out that the appearances were false.'" *Id.* (citing CRIMINAL JURY INSTRUCTIONS, *supra,* No. 5.15) (other citations omitted). The trial court properly instructed the jury consistent with these principles.

In light of the jury's express findings as to Alcindore's perceptions and intent and the court's instructions on self-defense, it is difficult to discern how the jury rejected Alcindore's self-defense claim unless it misunderstood the court's instructions. Thus, as Alcindore argues, the trial court was presented with an inconsistency which reflected its confusion or a misunderstanding of the law concerning how to assess the reasonableness or unreasonableness of Alcindore's actions. These circumstances required the court to re-in-

THE COURT: All right, all right, you have said it.
＊　＊　＊　＊　＊　＊

THE COURT: Bring the jury in.

struct the jury to address this apparent confusion. *See Whitaker, supra,* 617 A.2d at 501 (citing *Murchison, supra,* 486 A.2d at 83; *Bedney v. United States,* 471 A.2d 1022, 1024 (D.C.1984)); *United States v. Bolden,* 169 U.S.App. D.C. 60, 67, 514 F.2d 1301, 1308 (1975))(other citations omitted) ("Where a jury has demonstrated confusion ... the trial judge may not allow that confusion to continue, but must make an appropriate and effective response.") In some circumstances, re-instruction may provide an avenue to clarify the court's instructions and assure that the jury does not make contradictory or inconsistent findings. *Whitaker,* 617 A.2d at 504; *see also Bedney,* 471 A.2d at 1024. Here, any re-instruction should have included the circumstances under which a person may use deadly force in self-defense and made clear that the test is whether the *defendant,* as opposed to the jury or anyone else, actually and reasonably believed such force to be necessary to avoid his own serious bodily harm.

The government argues that *Whitaker* has no application to the facts of this case. Specifically, it contends that in *Whitaker,* the court was presented with a verdict that was "logically irreconcilable" with the court's instructions, while in this case there was nothing about the jury's note and verdict that was inconsistent with the trial court's instructions. While the facts of *Whitaker* differ, the general principles involved there are applicable to the circumstances presented here.[9] Where a jury shows through a note that it is confused and is ready to return a verdict logically inconsistent with the court's instructions, the defense is entitled, upon request, to an appropriate re-instruction. *Whitaker, supra,* 617 A.2d at 502, 508. For the reasons previously stated, we have concluded that there was sufficient inconsistency between the jury's factual findings and its legal conclusions to show that it was prepared to return a verdict inconsistent with the law.[10] Under the circum-

9. In *Whitaker,* the defendant was convicted of possession of a firearm during a crime of violence (PFCV) (D.C.Code § 22–3204(b)). *Whitaker, supra,* 617 A.2d at 500. The jury had been instructed that it must return a verdict of not guilty of PFCV if it did not find the defendant guilty of the predicate offense of assault with a dangerous weapon (ADW). *Id.* at 501. Before the verdict, the jury sent the court a series of four notes indicating that it was unable to reach a verdict on the ADW charges, but had reached a verdict on the PFCV count. *Id.* The trial court declined defense counsel's request for an instruction, noting that there was no expression of confusion and that the instructions previously given were proper. *Id.* Concluding that an instruction was warranted, upon the request of the defendant, to clear up the jury's apparent confusion, we reversed the conviction. *Id.* at 503–04.

10. Alcindore argues, for the first time on appeal, that the jury's note indicating its finding that he never intended to harm Ames demonstrates that the jury did not find the requisite

element of intent to convict him of mayhem while armed and aggravated assault. The government argues that the law permits a finding of guilt on alternate grounds that appellant knowingly and voluntarily engaged in conduct that created an extreme risk of serious bodily injury for each count. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Nos. 4.06A, 4.14 (4th ed.1993). In light of our disposition of Alcindore's first argument, we need not resolve this one. However, we note that the conceded presence of an inconsistency between the jury's express findings as to Alcindore's intent and at least one aspect of the intent requirement for proving mayhem and aggravated assault, when considered along with the challenge that Alcindore actually made in the trial court, tends to buttress Alcindore's argument that re-instruction was required. In other words, as the court examined the issue Alcindore raised with respect to the inconsistency between the jury's findings and his self-defense claim, it had to be mindful of the requisite elements of the underlying offenses with which he was charged, including intent

stances, Alcindore was entitled to re-instruction to address and clear up the jury's confusion.[11] *See id.* at 503.

For all of the foregoing reasons the judgment appealed from hereby is reversed and remanded for a new trial on all counts for which Alcindore was convicted with the exception of CPWL. With respect to the CPWL count, we affirm.[12]

*Reversed in part and affirmed in part.*

### Appendix

The trial court's instructions on self-defense read, in pertinent part, as follows:

Every person has the right to use a reasonable amount of force in self-defense if two conditions are met. One is that he actually believes that he is in imminent danger of bodily harm.

And secondly, he has reasonable grounds to hold that belief . . . .

The question is not whether looking back on the incident you believe that the use of force was necessary. Rather, the question is whether the defendant under the circumstances as they appeared to him at the time of the incident actually believed hat he was in imminent danger of bodily harm and whether it was reasonable for him to have held that belief.

. . . the Government must prove beyond a reasonable doubt that defendant . . . did not act in self-defense.

. . . A person may use a reasonable amount of force in self-defense including in some circumstances deadly force.

Deadly force is such force that is likely to cause the death of another person or if not death, serious bodily harm. A person may use deadly force in self-defense if he actually and reasonably believes at the time of the incident that he is in imminent danger of death or imminent danger of serious bodily harm himself from which he can save himself only by using deadly force against the person he perceives is attacking him or about to attack him.

. . . Even if the other person, that is the complainant, is shown to have been the aggressor and even if the defendant is justified in using force in self-defense, he may not use any greater degree of force than he actually and reasonably believes to be necessary under the circumstances to prevent the harm that he reasonably believes is intended to save his life or to avoid his own serious bodily harm.

\*     \*     \*     \*     \*     \*

The law does not require a person to retreat or to consider retreating when he actually and reasonably believes that he is in danger of death or serious bodily harm and that deadly force is necessary to repel the danger.

But the law does say that a person should take reasonable steps such as

---

which the note mentioned specifically. Recognition of those elements tends to add to the factors discussed above which demonstrated jury confusion and suggested the need for court intervention, upon appellant's request, to clear up the confusion.

11. The able trial judge was presented with a difficult situation. There is a sensible reluctance to provide such guidance after the jury has indicated its verdict in the note to avoid the possibility of intruding into the delibera-

tive process. Nevertheless, where the jury has demonstrated its confusion before the final verdict is taken in open court, the court must take action to "clear away that confusion." *Whitaker, supra,* 617 A.2d at 502–03.

12. In light of our disposition, we need not reach Alcindore's remaining challenge that the trial court erred in overruling defense objections to allegedly improper and prejudicial statements in the prosecutor's closing argument.

stepping back or walking away to avoid the necessity of taking a human life so long as those steps are consistent with the person's own safety.

\* \* \* \* \* \*

If the defendant actually and reasonably believed that he was in imminent danger of death or serious bodily harm and that deadly force was necessary to repel the danger, then he may use deadly force in self-defense.

Indeed he may do so even though afterwards it turns out that the appearances were false because either he was not actually in imminent danger or deadly force was not necessary.