Lawrence A. PREACHER, Appellant,

v.

UNITED STATES, Appellee.

No. 01–CF–918.

District of Columbia Court of Appeals.

Argued Oct. 28, 2003.

Decided Aug. 30, 2007.

Eric K. Klein, Public Defender Service, with whom James Klein and Timothy P. O'Toole, Public Defender Service, were on the brief, for appellant.

Thomas S. Rees, Assistant United States Attorney, with whom Roscoe C. Howard, Jr., United States Attorney at the time the brief was filed, and John R. Fisher, Assistant United States Attorney at the time the brief was filed, Thomas J. Tourish, Jr., and John J. Soroka, Assistant United States Attorneys, were on the brief, for appellee.

Before REID, Associate Judge, and WAGNER and STEADMAN, Senior Judges.[*]

PER CURIAM:

Following a jury trial, appellant, Lawrence A. Preacher, was convicted of manslaughter while armed, the lesser-included offense of second degree murder while armed, and carrying a dangerous weapon (CDW). His principal argument on appeal is that the trial court erred in failing to answer the jury's question about what constitutes an assault, in the context of that portion of the jury instructions explaining the circumstances for consideration in determining whether the use of deadly force was excessive, thereby resulting in the loss of appellant's self-defense claim. We agree that the trial court erred in failing to respond to the jury's question, and reverse.

## I.

### Factual Summary

The charges arose out of the stabbing death of Dennis Caine in the early morning hours of July 4, 1999. Michelle O'Neal Thomas (O'Neal), a witness called by the government, testified that at the time of Caine's death, she was thirteen years old and lived with her mother, Michelle Thomas (Shelly), at 1810 Savannah Place, S.E.[1] She testified that she met Caine through her mother, who was in a relationship with him. According to O'Neal, at about 10:00 or 11:00 that night, she accompanied her mother, Caine, and Nathaniel (Nate) Bowen, her friend, to a liquor store where they purchased beer. While there, O'Neal heard appellant ask Caine whether he could drive him home, and Caine replied that the car was too full. O'Neal testified that appellant met them back at the Savannah Street apartment where the others, with the exception of O'Neal and appellant, were drinking.[2] At some point, Shelly ran out of the apartment with Caine's car keys, and he followed her. Bowen, O'Neal and appellant also went outside. According to O'Neal, Shelly and appellant began to argue over a bag of chips that Shelly retrieved from the trunk of Caine's car, and Caine told appellant that he had purchased them for Shelly. Afterwards, appellant went to the front driver's side of the car and picked up a

[*] At the time of argument, Judge Wagner was Chief Judge of the court, and Judge Steadman was an Associate Judge.

1. Since the Thomases have the same first and last names, for convenience the mother is referred to as "Shelly," and her daughter is referred to as "O'Neal."

2. O'Neal said that appellant did not drink anything while in the apartment, but he had been drinking earlier and had a beer in his hand while walking toward the house. The parties stipulated that Caine had a blood alcohol level of .12 when he died and that the legal limit for purposes of driving while intoxicated is .08 in the District of Columbia.

boxcutter from the front seat. O'Neal testified that appellant realized it was not his when he checked and found that he had his knife. Appellant put the boxcutter back, and Caine picked it up, held it in his hand down by his side, and walked to the back of the car where Shelly and appellant were arguing. O'Neal testified that she heard no exchange of words between Caine and appellant, but she heard her mother tell appellant that she was going to smack him. According to O'Neal, appellant then moved closer to Shelly, Caine moved to Shelly's side, and appellant then stabbed Caine and left. Caine, while still holding the boxcutter in his hand, told Nate Bowen that appellant stabbed him.

Shelly Thomas recalled Caine and appellant having some words that night, but she could not remember what they said. She testified that she was between Caine and appellant and that she just saw a reflection of appellant's hand before Caine said that he had been stabbed. She described appellant's knife, which she had seen before, as one that opens with the push of a button. Shelly admitted that she had had two 24–ounce cans of malt liquor to drink that night and that she had used crack cocaine at about 6:00 p.m. on the evening of July 3rd.

Appellant's version of events differed. According to appellant's videotaped statement, which was admitted into evidence, he went to 1810 Savannah Place, S.E. to collect $500 that Shelly owed him. When he confronted her about the money while on the street, Shelly cursed and slapped appellant, and he tried to prevent her from hitting him again. Appellant said that

Caine, the decedent, who was in a relationship with Shelly at the time, moved toward him swinging the boxcutter, and appellant pulled a knife from his pocket, stabbed Caine in the stomach, and ran.

## II.

### Claim of Instructional Error/Self Defense

Appellant argues that the trial court erred in failing to respond to the jury's question concerning what constitutes an "assault" in the context of the jury instruction concerning the reasonableness of appellant's use of deadly force against the decedent. He contends that the trial court's repetition of the general self-defense instruction in response only confused and misled the jury. Appellant contends that the error was compounded by the fact that Shelly Thomas slapped him as a part of the circumstances that led to his decision to use deadly force to protect his life. The government argues first that the "invited error" doctrine bars appellant's instructional challenge. It also argues that the court did not abuse its discretion, but followed a prudent course in re-instructing the jury after extended discussions with counsel.

### A. *Procedural Background*

On the third day of jury deliberations, the jury sent two notes to the court, one of which included the following inquiry:

Questions/Explanation Needed

(1) p. 11 3rd paragraph, 2nd Sentence

(2) What constitute[s] assault[?] [3]

3. The court mentioned that both notes had been received at the same time. The first note also sought guidance on the claim of self-defense. It stated as follows:

> We the jury are uncertain on several points and need clarification

1. If a man could have left the scene at any time right up to the point of [imminent] danger, when does self-defense apply?
2. The law on standing your ground and the law on taking steps to keep from taking a life is confusing to us.

There is no dispute that the jury's inquiry about the meaning of assault pertained to that portion of the standard jury instruction that reads:

A person acting in the heat of passion caused by an assault does not necessarily lose his/her claim of self-defense by using greater force than would seem necessary to a calm mind. In the heat of passion, a person may actually and reasonably believe something that seems unreasonable to a calm mind.

CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.13 C (4th ed.2002). An extended discussion ensued between the court and counsel, during which they considered possible implications of the second note and options for responding to it. The prosecutor expressed concern that the jury's inquiry might be related to whether the alleged slapping of appellant by Shelly Thomas could "create that heat of passion that would excuse the use of self-defense," and he argued that only an assault by the victim was referred to in the heat of passion instruction. The court suggested that it could respond that the instructions referred to an assault by the decedent upon the appellant. While defense counsel agreed that Shelly Thomas' alleged assault upon appellant would not have justified self-defense against the decedent, she argued that it was one factor bearing upon his state of mind at the time he decided that he had to use deadly force against Caine. Defense counsel also stated that decedent's actions in "stepping toward [appellant] could be defined as an assault." Ultimately, the court responded to the jury's two notes by re-instructing them on the law of self-defense.[4] At one point, the court considered reading the instruction on assault, but opted not to give it. With respect to an assault caused by the heat of passion, the court inserted, without objection, the language that appears in italics in the following portion of the standard instruction:

In deciding whether the defendant used excessive force in defending himself, you may consider all the circumstances under which he acted. A person acting in the heat of passion caused by an assault, *and in this case if the defendant was acting in the heat of passion caused by an assault by [decedent]*, that person does not necessarily lose his claim of self-defense by using greater force than would seem necessary to a calm mind.

After the court re-instructed the jury, but before the jury retired to deliberate, defense counsel requested that the court give the instruction on assault. Defense counsel argued that the jury might not have understood from the instructions that an assault can occur without actual physical contact. Although the court agreed that lay people may not understand that concept, it stated that it anticipated that the jury would send another note indicating that the court's responses to its questions were not helpful, as the court had invited them to do. The court denied the requested instruction and permitted the jury to resume deliberations. The next note that the jury sent informed the court that it had reached a verdict on all counts.

### B. *Applicable Legal Principles*

■■■ Generally, decisions on how to re-instruct a jury are within the trial

---

3. If a man sees himself going into a violent situation, at what point does self-defense cease to apply?

4. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, Nos. 5.12 (self-defense-general considerations), 5.13 B (deadly force), 5.13 C (excessive force), 5.14 B (deadly force/false appearances) and 5.15 (no duty to retreat).

court's discretion and will not be reversed absent an abuse of that discretion. *Alcindore v. United States*, 818 A.2d 152, 155 (D.C.2003) (citing *Whitaker v. United States*, 617 A.2d 499, 501 (D.C.1992) (citing *Davis v. United States*, 510 A.2d 1051, 1052 (D.C.1986))). "When the jury explains specific difficulties, the trial court 'should clear them away with concrete accuracy.'" *Id.* (quoting *Whitaker*, 617 A.2d at 501 (quoting *Bollenbach v. United States*, 326 U.S. 607, 612–13, 66 S.Ct. 402, 90 L.Ed. 350 (1946))); *see also Murchison v. United States*, 486 A.2d 77, 83 (D.C. 1984) (noting that the "trial court is under an obligation to respond to a jury's confusion, particularly where the jury made explicit its difficulties") (internal citations omitted). "[W]here a jury shows confusion about a central aspect of applicable law, and the general instruction did not provide the legal information needed, reversible error occurs when the court does not respond to the jury's note." *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987) (citing *United States v. Bolden*, 169 U.S.App.D.C. 60, 67–68, 514 F.2d 1301, 1308–09 (1975)) (other citation omitted). If the jury demonstrates its confusion before the final verdict is taken in open court, the court is required to take some action in an effort to "clear away that confusion." *Alcindore*, 818 A.2d at 159 n. 11 (quoting *Whitaker*, 617 A.2d at 502–03).

### C. *Analysis of Claimed Instructional Error*

Appellant argues that here the jury clearly expressed its confusion about the self-defense instructions and asked specifically what constitutes an assault in that context. He contends that since the court gave no response to the jury's specific question, the jury was left unguided on whether the decedent's conduct could have amounted to an assault. Appellant argues that the court's instruction that one could act in the heat of passion in response to an assault from the decedent, as opposed to anyone else involved in the circumstances, reinforced the jury's erroneous assumption that an assault required physical contact.

■ We consider first the government's preliminary argument that appellant invited the error. The government argues that the defense invited the error because it ignored the trial court's initial offer to define "assault," shared initially the court's reservations about defining assault, suggested that the court re-instruct the jury on self-defense, and requested the assault instruction only after the court had already reinstructed the jury. Generally, the invited error doctrine precludes a party from asserting as error on appeal a course that he or she has induced the trial court to take. *District of Columbia v. Wical Ltd. P'ship*, 630 A.2d 174, 183–84 (D.C.1993) (citation omitted) (explaining the invited error doctrine, but holding that its bar to claims of error on appeal is not absolute). Applying that doctrine, this court has rejected a claim of instructional error where defense counsel failed to make clear that his initial position had changed and that he was requesting self-defense and defense of a third person instructions unconditionally. *Cowan v. United States*, 629 A.2d 496, 502–03 (D.C. 1993); *see also* Super. Ct.Crim. R. 30 (precluding a party from assigning as error jury instructions to which no objection was made before the jury retired to deliberate). Rule 30's requirement is also applicable to re-instructions, and therefore, any objections or requests must be made before the jury continues deliberations. *Robinson v. United States*, 649 A.2d 584, 586 (D.C.1994) (citing *Deneal v. United States*, 551 A.2d 1312, 1316–17 (D.C.1988)). The failure to comply with the requirements results in review under the high

standard of plain error. *Id.* (citation omitted).

This case differs from *Cowan* in that appellant's counsel made clear the request for an instruction on assault before the jury resumed deliberations following its note specifically requesting the definition of "assault." Therefore, appellant's request for the instruction complied with the requirements of Rule 30. Thus, consistent with the purpose of the rule, the court had the "opportunity to correct errors and omissions which otherwise might necessitate a new trial...." *Robinson, supra,* 649 A.2d at 586 (quoting *Deneal, supra,* 551 A.2d at 1316). Although the court and counsel discussed various ways to respond to the jury's inquiry before the court repeated the self-defense instructions, defense counsel ultimately made clear the request for an instruction on assault and the reason for that request before the jury resumed deliberations. *Cf. Cowan, supra,* 629 A.2d at 503 (faulting counsel's failure to state "distinctly," with "reasonable specificity," or with "sufficient precision" a change in its initial position about the instructions requested). Therefore, we conclude that appellant adequately preserved his request for the assault instruction in response to the jury's note.

The jury asked specifically what constitutes an assault in the context of the court's initial instruction explaining that "[a] person acting in the heat of passion caused by an *assault* does not necessarily lose his/her claim of self-defense by using greater force than would seem necessary to a calm mind." (Emphasis added.) The jury's question was clear, and it was cen-

tral to their consideration of appellant's claim that he acted in self-defense.[5] Therefore, the trial court was required to respond to the question "with concrete accuracy." *Bollenbach, supra,* 326 U.S. at 612–13, 66 S.Ct. 402. The court did not answer the jury's specific question, but opted to repeat the standard self-defense instructions. Appellant argues that the repetition of the self-defense instructions could not take the place of a concrete and accurate recitation of the law of assault in response to the jury's question. While the court's re-instruction may have cleared away some of the jury's confusion expressed in its first note,[6] it provided no guidance with respect to the jury's request for a definition of assault contained in its second note. The term "assault" was not defined anywhere else in the instructions, although the word appeared in the self-defense instructions that the court gave initially and repeated. The court was required to respond to the jury's request for legal guidance concerning this issue that was central to the defense's case. *See Potter, supra,* 534 A.2d at 946. The defense sought to show that Caine's approach toward appellant with an open box cutter constituted an assault which the jury could consider in determining his state of mind and whether under the circumstances he used excessive force. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 5.13 C.

The government argues that the jury could have inquired further, given the court's invitation that they do so if it had not responded to their questions. However, clarification of this particular question was not required before the court could

---

5. The government argues that the jury's questions, taken as a whole, were ambiguous. While the jury presented a number of questions in two notes that gave the court and counsel pause, the second note asking for a definition of "assault" was straight forward

and unambiguous. Therefore, we find the government's argument in this regard unpersuasive.

6. *See* note 1, *supra.*

respond. There was no ambiguity.[7] *See Potter,* 534 A.2d at 946 (noting that the court is not required to answer an ambiguous jury note without seeking clarification) (citing *Murchison, supra,* 486 A.2d at 83). Under the circumstances, the trial court's failure to respond to the jury's question was error. *See Alcindore, supra,* 818 A.2d at 157–58.

### D. *Harmless Error Analysis*

■ Appellant argues that since the trial court failed to answer the jury's question on a central issue concerning whether appellant lost his right to claim self-defense by using excessive force, the government must prove that the error was harmless beyond a reasonable doubt under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). The government argues that where, as here, there is no claim that the court failed to instruct on an element of the offenses charged and the standard for conviction, the proper test for error is for non-constitutional, harmless error under *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

This court has held that

The provision of an answer to a jury note that is adequate to dispel jury confusion on a controlling issue of a case is such an important aspect of due process of law that we would have to be satisfied

beyond a reasonable doubt that an omission to provide them was harmless before we could conclude that it did not vitiate the verdict.

*Potter, supra,* 534 A.2d at 946 (citing *Chapman, supra,* 386 U.S. at 18, 87 S.Ct. 824). We need not decide which standard applies because the same result obtains applying either standard.

Here, the issue of what constitutes an assault was central to appellant's self-defense claim. In order to convict appellant of manslaughter, the jury had to find beyond a reasonable doubt that appellant did not act in self-defense. *Comber v. United States,* 584 A.2d 26, 41 n. 17 (D.C.1990) (citing *Davis v. United States,* 510 A.2d 1051, 1053 (D.C.1986)). The key issue in the case was whether appellant acted in self-defense and used a reasonable amount of force to repel the danger. The prosecutor focused the jury on the excessive force instruction and argued that the decedent's conduct did not justify appellant's jamming a knife four inches into decedent's body. Consistent with the court's instructions, the jury had to determine, *inter alia,* whether appellant acted in the heat of passion caused by an assault, a term that remained undefined in spite of the jury's question. The jury made clear in the second note that they needed guidance on what constituted an assault within the meaning of the instructions. As the trial

---

7. The government argues that it was not clear whether the jury's question about assault focused on the actions of Shelly Thomas or the decedent. However, the jury did not indicate the assaultive conduct upon which they were focused, nor was that necessary to clarify their question. The jury simply asked for a definition of "assault" as used in a portion of the self-defense instructions. Supplied with a definition, the jury could have applied the facts it found from the evidence in accordance with the law as given by the court. It did not have that opportunity. We agree with appellant that the error was compounded by

the fact that the slap by Shelly Thomas was a circumstance bearing on appellant's state of mind when he acted. The jury could consider that appellant appeared to be confronted by two hostile individuals, one with a boxcutter, when he acted. "[S]ubjective perceptions are the prime determinant of the right to use force—and the degree of force required—in self-defense, subject only to the constraints that those perceptions be reasonable under the circumstances." *Alcindore, supra,* 818 A.2d at 157 (quoting *Fersner v. United States,* 482 A.2d 387, 391–92 (D.C.1984)).

court recognized, what constitutes an assault, particularly assaults that do not involve an actual physical touching, may not be obvious to a lay person. Using language from the standard instruction on assault, the jury could have found from the evidence that Caine's conduct amounted to an assault against appellant which caused him to actually and reasonably believe that his life was in danger and that he had to use deadly force to repel the attack. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.06.[8] The definition of assault had a critical meaning in the self-defense instruction which the jury sought to ascertain. Under these circumstances, the error was not harmless beyond a reasonable doubt. *See Potter, supra,* 534 A.2d at 946.

Even under the *Kotteakos* standard, we cannot say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error...." *Kotteakos, supra,* 328 U.S. at 765, 66 S.Ct. 1239. This was a close case, the issue affected by the error was central to the defense, and no action was taken to mitigate the error. *See Clark v. United States,* 593 A.2d 186, 192–93 (D.C.1991) (setting forth as factors for determining whether the error was harmless under *Kotteakos,* "the closeness of the case, the centrality of the issue affected by the error, and any steps taken to mitigate the effects of the error"). The trial court itself observed that it was a close case. *See also Patton v. United States,* 633 A.2d 800, 812 (D.C.1993) (noting the trial court's assessment that the case was extremely close and finding harm under the *Kotteakos* standard). Here, there was evidence from which the jury could find that Caine had previously tried to attack Shelly Thomas' husband with a knife; that decedent approached appellant with an opened boxcutter which he still had in hand after the stabbing; that Caine was intoxicated; that Caine moved toward appellant, who was in an argument with Shelly, a woman with whom Caine was in a relationship; and that appellant thought that Caine "was going to do something to [him]" with the boxcutter. The trial court's failure to respond to the jury's question on a central issue to the defense in a close case creates an unacceptable risk that the verdict stemmed from a mistaken understanding of the law. *See Foster v. George Washington Univ. Med. Ctr.,* 738 A.2d 791, 792 (D.C.1999).

For the foregoing reasons, the judgment appealed from hereby is reversed, and the case is remanded for a new trial.[9]

*So ordered.*

---

8. The standard instruction provides definitions for "attempted-battery" assault and intent-to-frighten assault. *See* CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 4.06 A and B. Instruction No. 4.06 A defines an assault as "an attempt or effort, with force or violence, to injure another person," voluntarily and on purpose, while having an apparent present ability to do so. Instruction No. 4.06 B defines an "intent-to-frighten assault" as the voluntary and purposeful commission of "a threatening act that reasonably would create in another person a fear of immediate injury," while having "the apparent present ability" to do so. Optional language in instruction No. 4.06 A informs the jury specifically that "[a]n assault may be committed without actually touching, striking, or committing bodily harm on another, but the mere use of threatening words is not an assault." Given the evidence in the case concerning Caine's actions, it was important to define assault for the jury and to explain that an assault could occur without an actual physical touching.

9. Appellant also argues that the trial court erred in: (1) submitting the charge of second-degree murder to the jury; and (2) failing to intervene, *sua sponte,* when the prosecutor

argued facts not in evidence and appealed the jury's passions and prejudices. In light of our disposition of the case, we need not address these issues. We also need not address appellant's claim of error in the instruction on the CDW count. His conviction on that count was obviously affected by the conviction on the manslaughter account, both of which must be vacated for a new trial.