Marcus **PATTERSON**, Appellant,

v.

**UNITED STATES**, Appellee.

Nos. 08–CF–876, 10–CO–1611.

District of Columbia Court of Appeals.

Argued Sept. 13, 2011.

Decided Feb. 16, 2012.

Dennis M. Hart, appointed by the court, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III and Sherri L. Berthrong, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and THOMPSON, Associate Judges, and NEBEKER, Senior Judge.

NEBEKER, Senior Judge:

After a three-day trial, the jury found appellant guilty of armed robbery[1] and possession of a firearm during a crime of violence[2] ("PFCV").[3] The trial court sentenced appellant to 108 months followed by five years of supervised release for each crime, to be served concurrently. This court consolidated appellant's direct appeal and his appeal from the trial court's denial of his § 23–110/new trial motion. Appellant argues on direct appeal that the trial court erred by (1) refusing to allow appellant to present an expert witness on the subject of identification testimony, (2) failing during trial to conduct an appropriate inquiry into appellant's dissatisfaction with defense counsel's conduct, and (3) failing to correct the government's assertedly impermissible closing argument that appellant's defense was "malarkey" and "garbage," *sua sponte*. Appellant also contends that the trial court erred in denying his § 23–110 motion without a hearing on appellant's allegation of ineffective assistance of counsel based on his attorney's failure to present evidence regarding his hand tattoo and failing to investigate another suspect's claim of guilt of the crime.[4] We disagree and affirm.

## I.

At approximately 6:30 PM on April 11, 2007, near 31st Street and Avon Lane, a man, whose face was unobstructed, approached the victim, Mira Kuczynska, within three to four feet. The man mumbled what sounded like "this is a robbery," and he displayed a "western-style" revolver with a brown and dark yellow handle in his waistband. After approximately ten seconds, the man grabbed her purse and then ran off. Her purse contained, among other things, her wallet, credit cards, identification, a checkbook, and mobile phones.

After the incident, Ms. Kuczynska described the man to police as an African-American male in his late twenties or thirties who was about six feet tall,[5] thin-figured, with a medium skin complexion, and short hair with some facial hair. Shortly thereafter when police stopped a person for Ms. Kuczynska to perform a

---

1. D.C.Code § 22–2801 (2001); D.C.Code § 22–4502 (2011 Supp.).

2. D.C.Code § 22–4504 (2001).

3. This appeal comes from appellant's third trial. In appellant's first trial appellant was tried for two counts of armed robbery, one count of assault with intent to rob while armed, four counts of PFCV, and one count of assault with a dangerous weapon. The trial court declared a mistrial because the govern-ment was unable to produce a key witness—Jarwon Scott. In appellant's second trial, the government proceeded only on one count each of armed robbery, assault with intent to rob while armed, and PFCV. The second trial resulted in a hung jury mistrial.

4. D.C.Code § 23–110 (2001).

5. The record shows that appellant was 6′3″ tall.

show-up identification, she stated that the person the police presented to her was not the one who robbed her.

After the robbery a number of significant events occurred. Approximately twenty minutes after the robbery, Monica Barnes, a person that appellant, while being interviewed by police, characterized as his girlfriend, placed a phone call using Ms. Kuczynska's cellular telephone. A Giant store video surveillance revealed that on April 14th, 2007, Monica Barnes alighted from a silver minivan in a Giant food store parking lot in Laurel, Maryland, entered the store, and used an altered check belonging to Ms. Kuczynska to purchase gift cards. Approximately twenty minutes later, appellant, wearing a multi-colored sweater-jacket, returned to the same cashier to purchase a large amount of gift cards with another one of Ms. Kuczynska's altered checks, but the store detective refused to accept the check and escorted appellant out of the store. Appellant entered a silver minivan in the parking lot and drove off with Monica Barnes. On April 19, 2007, Anthony Gain, accompanied by his girlfriend and appellant, returned a silver Dodge Caravan minivan to Progressive Rent–a–Car that he had rented three days earlier. The three were arrested by Laurel police. Assisted by D.C. Metropolitan Police Department ("MPD") detectives, Laurel police interviewed appellant, who provided information leading to a Motel 6 location in Laurel.

Police obtained a search warrant to search the Motel 6 room. When they arrived at the motel, its guest registry reflected that the motel management had rented a room to Ms. Kuczynska.[6] MPD Detectives Michael Ross and Keith Tabron went to the room and after knocking on the door and announcing their presence and purpose, Monica Barnes opened the door. One Jarwon Scott was inside.[7] In the room police recovered a multi-colored jacket appearing to be the same jacket worn by appellant in the surveillance tape from the Giant food store. Inside the jacket was a prescription bottle belonging to a person named "Franklin Powell," the same name used by appellant to introduce himself to the police in his interview on April 19th.[8] Police seized a cell phone, personal check,[9] and a credit or debit card—all Ms. Kuczynska's stolen property. A black, .38 caliber revolver with a brown handle—similar to the description provided by Ms. Kuczynska—was hidden under the mattress. Police also located a Giant store receipt and an identification card with a photograph of Barnes and Ms. Kuczynska's name on it.

Nine days after the robbery, Ms. Kuczynska identified appellant in a photo array and stated she was positive that appellant was the robber. She also identified appellant at trial. As will be seen later, there is significance to the fact that a motion to suppress photo identification was denied and that issue is not presented on this appeal.

6. Barnes also admitted that she rented the room with an American Express gift card she purchased with Ms. Kuczynska's altered check. Barnes was charged with forgery in Prince George's County, Maryland for this crime.

7. Scott is a youthful-looking man, approximately 5'5" tall, with a light brown skin complexion, a dreadlocks hairstyle, and barely any facial hair.

8. Barnes also said that appellant used the alias Franklin Powell.

9. Barnes claimed that Gain and Scott provided her with the cell phone and the checkbook on April 11th. Gain claimed he did not know anyone named Jarwon Scott and he did not recognize photos of Scott or Barnes.

## II.

### A. Direct Appeal

#### 1. Expert Testimony

Prior to the beginning of the first of his three trials, appellant filed a motion seeking leave to introduce expert testimony of Dr. Henry Shulman, a professor of psychology at Ohio State University, "on psychological factors of memory and perception that may affect the accuracy of eyewitness identifications." The government filed a "motion in opposition" to the expert testimony arguing that the victim's identification was corroborated by the fact that appellant was arrested in a vehicle containing some of Ms. Kuczynska's stolen property, appellant was seen on the Giant store surveillance video attempting to pass checks in Ms. Kuczynska's name, and because appellant sent police to the motel room where more of Ms. Kuczynska's stolen property was located.

The trial judge denied the motion, distinguishing appellant's case from past cases where he had admitted such testimony. For the court, the key distinction was that cases where the court had admitted expert testimony in the past were ones where there was little corroborating evidence; in those cases, the court reasoned, expert testimony on identification "would [have been] helpful to the [jury]" on cross-racial identification. In appellant's case, the court concluded:

> [W]ith respect to eyewitness identification I have ruled previously in cases that—having heard from Dr. Schulman (phonetic) that on a very narrow issue of cross racial (phonetic) identification I have permitted expert testimony in that area where the government didn't have much other evidence in the case and I thought it would be of assistance to the trier of fact. I thought Dr. Schulman has demonstrated to me there was suffi-

cient basis under Dias (phonetic) to admit the testimony in one—maybe two cases I've tried. I do remember one where there is very little corroborative evidence in the case and there was sufficient evidence. I thought the testimony about cross racial identification would be helpful to the trier of fact. . . . [T]he calculus in this case is a little bit different. This is certainly not one of those cases where I think, you know, the issue of cross racial identification is one that I think needs to be explored by an expert. There is abundant corroborative evidence in this case with regard to demonstrating Mr. Patterson's involvement in these offenses. He was observed cashing some of these check in another jurisdiction or trying to pass those checks. A room that's associated with him in Maryland. There are proceeds of the robbery that were found in that room. It was his girlfriend's room apparently but he was associated with that room in Maryland. He was identified in a vehicle that's been associated with those robberies. In a case like this I think that weighing the probative value versus prejudice having an expert testify in a case like this would put an unnecessary (indiscernible) on his opinion testimony and I'm not prepared to admit the testimony in this type of case. I have done it in other cases where the government had little or no other corroborative evidence and I thought it would be helpful to the trier of fact.

Moreover, the trial court added, the standard jury instruction would provide the jury "with all the guidance it needs to be able to determine the accuracy and reliability of eyewitness identification." Finally, the witness would be impermissibly involved in the jury reaching its "ultimate opinion about the reliability of the identification and give undue weight to [the ex-

pert's] opinion in the narrow area of cross racial identification." During appellant's second trial, presided over by a different judge, appellant renewed his request to introduce expert testimony, but that trial judge, too, denied the motion, stating that it had no reason "to revisit what was a . . . perfectly reasonable discretionary decision by [the previous trial judge]." [10]

Appellant contends that the first trial court erred when it refused to permit appellant to present an expert witness on identification testimony. Appellant argues that the first trial court failed to exercise its discretion by basing its decision on corroborative evidence, which is not part of the *Dyas* test. *See Dyas v. United States,* 376 A.2d 827, 832 (D.C.1977).[11] He also asserts that the second trial court's acceptance of the ruling of the first trial court was erroneous because some of the "corroborative evidence [relied upon by the first

trial judge] was different than that which the [third trial judge] based his decision to exclude [the expert testimony]."

We begin this part of the opinion by observing that appellant's assertion that corroborative evidence relied on by the first trial judge was different than that relied on by the third trial judge is belied by the record because all of the corroborative evidence referred to by the first trial court, save one minor fact,[12] was admitted during the third trial.

▪ Although some observe that the initial decision whether to admit or exclude expert testimony must be made in a vacuum, there is logic to stating that this particular proffer of asserted expert testimony could reasonably be evaluated in light of the government's opposition outlining corroborative facts establishing appellant's identity.[13] This is so because the funda-

10. As the judge in the third trial was the same judge who presided over the second trial, appellant did not renew the motion before the third trial began, and the government does not argue that appellant needed to renew the motion in order to preserve the claim for this appeal. For purposes of this appeal we treat the claim as preserved with this caveat: the first trial judge left this matter open for reconsideration if "there isn't as much corroboration as [he] initially thought." Since the appellant did not ask Judge Richter to reconsider what had been left open to him, it is not helpful to the concurrence to fault his analysis in maintaining the refusal of the expert proffer.

11. In *Dyas*, this court determined that in order to admit expert testimony: (1) the subject matter must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman; (2) the witness must have sufficient skill, knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth; and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a rea-

sonable opinion to be asserted even by an expert. *See Dyas, supra,* 376 A.2d at 832.

12. The first trial court cited to the fact that appellant was associated with the vehicle which was also associated with an April 17th robbery, a crime the government attempted to prosecute appellant of during the first trial and for which, another person, Jarwon Scott, pled guilty.

13. *Cf. Benn v. United States (Benn II),* 978 A.2d 1257, 1280 (D.C.2009) ("[W]here . . . corroboration of identification exists, the exclusion of . . . proffered expert testimony by the trial court generally does not constitute an abuse of discretion."); *Hager v. United States,* 856 A.2d 1143, 1149 (D.C.2004) ("[I]n cases where . . . corroboration of identification exists, the exclusion of the proffered expert testimony by the trial court generally does not constitute an abuse of discretion."). In *Benn II*, we factually distinguished *Hager* and *Green v. United States,* 718 A.2d 1042 (D.C.1998), and the persuasiveness of our reasoning in distinguishing those cases endures. In *Hager,* in addition to the eyewitness testimony being irrelevant because it was based on problems in stranger identification and Hager *knew* the

mental inquiry is whether the asserted expert testimony would assist the jury in rendering its verdict. *See, e.g., Smith v. United States*, 27 A.3d 1189, 1195 (D.C. 2011) ("[T]he decision to exclude expert evidence must be made on a case-by-case basis, grounded on the proffer made and on its potential to assist the jury in the particular case before the court." (alteration in original) (internal quotation marks omitted)); *Benn v. United States (Benn II )*, 978 A.2d 1257, 1274 (D.C.2009) ("As we emphasized in *Green* [*v. United States*, 718 A.2d 1042, 1051 (D.C.1998) ], the decision to admit or exclude expert testimony must be made on a case-by-case basis, grounded on the proffer made and on its potential to assist the jury in the particular case before the court."); *Hager v. United States*, 856 A.2d 1143, 1147 (D.C.2004) ("Thus, [i]n a jury trial the judge must exercise discretion to decide whether the proffered expert testimony is likely to assist the jury in the performance of its duties—that is to say, in understanding the evidence, determining the facts that must be found and rendering its verdict." (internal quotation marks omitted)); *Green, supra,* 718 A.2d at 1051 ("Surely it would be unnecessary and undesirable to present expert testimony in each and every case involving eyewitnesses, but there

may be cases in which a jury would find such testimony helpful." (footnote omitted)). We fully respect our colleague's view that under some, but not all circumstances, this type of testimony should be admitted when the jury requires assistance in deciding the verity of an identification. But, this issue, in discrete cases, must be tested on whether it was an erroneous exercise of discretion exercised under all circumstances present, not under a rule that such testimony must always be admitted because jurors are not fit to decide the issue unaided by expert testimony. When other evidence points to the verity of a victim's identification of the accused, such as the victim's depiction of the gun in a sketch immediately after the crime and the police's recovery of a gun in the motel matching that description, that evidence is a legitimate consideration for the trial judge in exercising judgment on whether to exclude such expert testimony. Life experiences are sufficient and a trial judge must be vested with discretion to sort out the various situations where experts may illuminate the question.

▇ In short, one may argue that the *Dyas* test does not include corroboration. And they would be correct. But our inquiry does not end there. Because we review the trial court's *exercise of its discretion* in

eyewitnesses, there was physical evidence against Hager. *See Benn II, supra,* 978 A.2d at 1280; *Hager, supra,* 856 A.2d at 1149. We also thought it was important to observe that we were "aware of no published opinion of this court, since our decision in *Brooks* [*v. United States*, 448 A.2d 253 (D.C.1982) ] twenty-seven years ago, affirming the exclusion of expert testimony on eyewitness identifications in a case in which the *only evidence presented* against the defendant was the identification of eyewitnesses who did not know the defendant." *Benn II, supra,* 978 A.2d at 1280 (emphasis added). The present case is in accord with *Benn II's* observations about our opinions after *Brooks.* We also took the opportunity to distinguish *Green* because of cor-

roborating physical evidence. *Id.* at 1281. Here, unlike Benn in *Benn II*, the substantial amount of corroborative evidence *does not, upon, "closer scrutiny* [,] *place* [ ] *the strength of the case in substantial doubt." Cf. id.* at 1282 (concluding that the evidence, upon *"closer scrutiny, places the strength of the case in substantial doubt "* because the five disinterested witnesses merely said that Benn "looked like" the perpetrator during the photo spread, three of which stated they were "95%" sure, and all five identified Benn in court). It should be noted, further, that we are not bound by the *dicta* of our previous opinions, but only by rules of law adopted as a part of decisions. *See In re D.T.,* 977 A.2d 346, 352 n. 1 (D.C.2009).

the exclusion of expert testimony for an *abuse of discretion,* our caselaw holds that the existence of corroborative evidence is probative of the verity of the trial court's decision-making.[14] *See Benn II, supra,* 978 A.2d at 1280; *Hager, supra,* 856 A.2d at 1149.[15] Here, the evidence as proffered, and as admitted at trial, hardly left the verity of identification of appellant as the actual robber beyond the ken of the jury. *Cf. Benn II, supra,* 978 A.2d at 1268 (concluding that although jurors "are not fully aware of the factors that influence eyewitness testimony," "[c]ertain factors that can influence an eyewitnesses' observation and recall are familiar to lay persons [including] cross-racial identifications" (internal quotation marks omitted)).

What is said above on this issue is hardly dicta as the concurrence asserts. It is necessary to our decision that the correct decisional law be stated so the trial court and the Bar are not confused by the concurrence, which views the proffered testimony as intrinsically or automatically admissible upon a determination of relevance. Indeed, the concurrence looks only to relevance, and jumps from that to the conclusion that discretion to deny admission of the testimony is abused unless the "error" is deemed harmless. It leaves no room for considering other evidence which alleviates the need to assist the jury in deciding the issue of identity. That predicate is not available to a division of the Court until, and if, the *en banc* court overturns the holdings of many decisions leaving to the trial judges whether, from all the evidence proffered or received, the jury will be assisted, confused or awed by the expert testimony. *See M.A.P. v. Ryan,* 285 A.2d 310 (D.C.1971).

■ However, in the interest of unanimity as to the result, we may, as the concur-

---

**14.** The concurrence acknowledges this, stating "I readily grant that where a challenged identification is corroborated, the appellate court may be able to conclude that the erroneous exclusion of expert testimony on eyewitness identification was harmless, and hence that there was no 'abuse' of discretion." The concurrence also points out that the expert testimony was, at the very least, relevant. This is, undoubtedly, correct. However, our examination of a trial court's exercise of discretion in the admission or exclusion of expert testimony, does not end there. *See, e.g., Smith v. United States,* 27 A.3d 1189, 1195 (D.C.2011) ("Generally, expert testimony should be admitted if it is relevant and likely to aid the trier of fact in the search for the truth." (internal quotation marks omitted)); note 11 *supra.* (setting forth the *Dyas* test on the admissibility of expert testimony).

**15.** A number of jurisdictions also reach this conclusion. *See, e.g., United States v. Crotteau,* 218 F.3d 826, 833 (7th Cir.2000) ("[W]hen there is corroborating evidence, expert testimony regarding the reliability of eyewitness identification is not necessary."); *Comm. v. Watson,* 455 Mass. 246, 915 N.E.2d 1052, 1062 (2009) ("Where there is additional evidence to corroborate an eyewitness's identification, a judge does not overstep the bounds of discretion in excluding expert testimony."); *Comm. v. Santoli,* 424 Mass. 837, 680 N.E.2d 1116, 1119 (1997) ("[O]pinions that rule that the exclusion of the expert testimony was or may have been error are typically those where there was little or no evidence to corroborate the eyewitness identification."); *People v. LeGrand,* 8 N.Y.3d 449, 835 N.Y.S.2d 523, 867 N.E.2d 374, 381 (2007) ("In the event that sufficient corroborating evidence is found to exist, an exercise of discretion excluding eyewitness expert testimony would not be fatal to a jury verdict convicting defendant."); *accord, Johnson v. State,* 272 Ga. 254, 526 S.E.2d 549, 552–53 (2000) ("Where eyewitness identification of the defendant is a key element of the State's case and there is no substantial corroboration of that identification by other evidence, trial courts may not exclude expert testimony without carefully weighing whether the evidence would assist the jury in assessing the reliability of eyewitness testimony and whether expert eyewitness testimony is the only effective way to reveal any weakness in an eyewitness identification." (footnote omitted)).

rence does, take the course of least resistance by assuming that if error there be, it was harmless, *accord, Benn II, supra,* 978 A.2d at 1283 ("In a case grounded on eyewitness identifications of a stranger, *without other corroborating evidence,* and in which the defense depends entirely upon demonstrating that the identifying witnesses are not as reliable as they believe themselves to be, to preclude the defendant from presenting the scientific testimony of a qualified expert on research that is generally accepted and not known to lay jurors to prove this point is not harmless under *Kotteakos* ...." (emphasis added)). *See generally Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

Here, the corroborative evidence establishing the accuracy of the victim's identification of appellant is quite notable, thus making any assumed error as to expert testimony harmless. It included Ms. Kuczynska's description of the perpetrator matching appellant and not Jarwon Scott,[16] Ms. Kuczynska's declining to identify a suspect as the perpetrator in a show-up immediately after the crime, her identification of appellant in the photo array, and the fact that appellant's effort to put the actual robbery at the hands of another in the gang would not have established actual innocence, but rather as one who shared in the spoils of the robbery by receiving the stolen property. In addition, Ms. Kuczynska had no opportunity to view the appellant other than during the crime, during the only photo array, and during trial. All of this justifies a harmlessness holding in this case. It is also noteworthy that appellant fails to pursue the effort to suppress the photo identification. Thus for our purposes the reliability of Ms. Kuc-

zynska's identification is further enhanced because there is no probability of an irreparable misidentification. *See, e.g., West v. United States,* 866 A.2d 74, 82–83 (D.C. 2005).

### 2. Right to Present a Defense

■■■ Appellant also argues that by excluding his expert testimony, the trial court denied him his constitutional right to present a defense. In *Heath v. United States,* we expounded on the meaning of the right to present a defense. There we noted that "[t]he Constitution guarantees a criminal defendant a meaningful opportunity to call witnesses in order to present a complete defense." *Heath v. United States,* 26 A.3d 266, 275 (D.C.2011). But " '[t]he accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence,' and ... 'trial judges [may] exclude evidence if its probative value is outweighed by ... unfair prejudice, confusion of the issues, or potential to mislead the jury.' " *Id.* at 276 (footnote omitted). "Rulings excluding (or admitting) evidence ordinarily are within the ambit of the trial court's discretion and are subject to review only for abuse of that discretion under the *Kotteakos* standard of harmlessness." *Id.* "It is the 'rare' case in which a trial court's 'application of a rule of evidence is so erroneous and unfair' as to deprive a defendant of a meaningful opportunity to present a complete defense." *Id.*

■■ The evidence is also subject to "a materiality requirement," meaning that "a defendant must demonstrate that the excluded evidence was important to his de-

16. As discussed *infra,* appellant also asserts that Scott took responsibility for both crimes. As repeatedly pointed out at trial, however, appellant and Scott look almost nothing alike.

Scott was a young-looking, short, beardless man with a dreadlocks hairstyle, and was 5′5." Appellant's appearance is different. *See* note 5 and accompanying text, *supra.*

fense in order to show that the error was of constitutional magnitude." *Id.* at 277 (internal quotation marks omitted). "[I]t must be reasonably probable (and not merely possible) that the jury would have harbored a reasonable doubt regarding the defendant's guilt if the evidence had [been admitted]." *Id.* at 280. This standard is less demanding than the preponderance-of-the-evidence test. *Id.* As the *Heath* Court explained: "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.*

■ Here, appellant was not denied a meaningful opportunity to present a defense. Appellant presented Monica Barnes in his defense, and Barnes corroborated appellant's argument of misidentification by stating that Ms. Kuczynska's book of checks and cell phone were given to her by Scott and Gain, not appellant. Moreover, the trial court did not prevent appellant from arguing that the witness misidentified appellant. Appellant "conducted ample cross-examination of Ms. [Kuczynska] on her ability to observe" the face of her assailant. *Id.* at 284. Appellant also argued, during closing argument, that stranger identification is less reliable, and that Ms. Kuczynska did not have enough time to observe appellant and focused on the gun instead. Given appellant's extensive presentation of his misidentification through argument and a witness, we conclude that the trial court did not violate appellant's constitutional right to present a defense. "We find it highly probable that the trial court's ruling did not influence the jury's verdict; we see no reasonable probability that the expert's testimony would have engendered an otherwise-nonexistent reasonable doubt of appellant's guilt in the juror's minds." *Id.* at 275.

### 3. *Monroe–Farrell* Claim

We now turn to appellant's argument that the trial court should have conducted a *Monroe–Farrell* inquiry because of "trial counsel's motion to withdraw filed [after the *first* trial, but] prior to the *second* trial." Appellant contends that as a result of that motion between the first and third trial, the third trial court should have made an inquiry into the relationship between counsel and appellant *during* the third trial when appellant stated to the court that he "could do better as [his] own lawyer." This argument does not persuade us.

■ Under *Monroe–Farrell,* appellant would have needed to make a "pretrial challenge to the effectiveness of counsel," *see Moore v. United States,* 675 A.2d 71, 74 (D.C.1996) (quoting *Monroe v. United States,* 389 A.2d 811, 820 (D.C.1978)), and appellant's satisfaction with counsel, as noted on the record, fails to be a challenge to counsel. The basis of appellant's challenge appears actually to be something that occurred *during* the previous trial. Moreover, "[a]ny claim of ineffectiveness must be specific and detailed; '[g]eneral assertions that a defendant wants a new lawyer are not enough to trigger a *Monroe–Farrell [v. United States,* 391 A.2d 755 (D.C.1978) ] inquiry.'" *Oliver v. United States,* 832 A.2d 153, 157 (D.C.2003) (quoting *Matthews v. United States,* 629 A.2d 1185, 1191 (D.C.1993)).

### 4. Right to Proceed Pro Se

Appellant also argues that the trial court erred because it did not "conduct an appropriate inquiry" into trial counsel's performance after appellant's statement that he "could do a lot better as [his] own

lawyer." We find no error by the court as to this contention.

Although "[a] defendant has a Sixth Amendment 'constitutional right to conduct his own defense,'" *Hill v. United States,* 959 A.2d 702, 708 (D.C.2008) (quoting *Faretta v. California,* 422 U.S. 806, 836, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975)), a court will not recognize a defendant's desire to proceed pro se unless the defendant "make[s] a positive demand upon the trial court for leave to proceed without counsel." *Perry v. United States,* 364 A.2d 617, 620 (D.C.1976). "In view of the fact that appellant did not at any time make a positive demand upon the trial court for leave to proceed without counsel, we are unable to find substance in his contention that *Faretta* provides cause for reversal." *Perry, supra,* 364 A.2d at 620. Appellant's statement was, at most, an expression of frustration with his attorney, not a clear and unequivocal declaration of a desire to represent himself to a judge.

### 5. Prosecutorial Argument Claim

Appellant argues that the trial court erred by not, *sua sponte,* correcting the government's assertedly improper comment during closing argument. Referring to appellant's use of Monica Barnes as a defense witness, the government stated during closing argument: "That is a bunch of malarkey. Frankly, shame on the [appellant] for putting his girl friend on the stand to try to sell you that garbage.... All of the evidence points to [appellant]." The government went on to describe the corroborative evidence. Appellant contends that, by using the term "malarkey," the government characterized appellant as a liar. The government's argument, appellant continues, also represented improper personal belief by the prosecutor.

"If appellant did not object, then our review is for plain error." *Wash-*

*ington v. United States,* 884 A.2d 1080, 1088 (D.C.2005). Under plain error review, appellant bears the burden of proving "(1) error, (2) that is plain, and (3) that affected appellant's substantial rights. Even if all three of these conditions are met, this court will not reverse unless (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Lowery v. United States,* 3 A.3d 1169, 1173 (D.C.2010) (internal quotation marks omitted). Plain error is error that was "clear or obvious," and this is a formidable burden. *Comford v. United States,* 947 A.2d 1181, 1189 (D.C.2008) (internal quotation marks omitted).

We evaluate claims of improper prosecutorial argument by first determining whether or not the challenged argument was improper. *See, e.g., Finch v. United States,* 867 A.2d 222, 225 (D.C. 2005). As this court has repeatedly stated, "[i]t is improper for a lawyer to express a *personal* opinion about a witness' veracity [or credibility] during arguments to the jury." *Id.* at 226 (internal quotation marks omitted). Yet, "it is proper for an advocate to argue that *the evidence* supports the conclusion that a witness is incredible." *Id.* The central distinction is "whether the attorney is commenting on the evidence, which he may do, or expressing a personal opinion, which is taboo. A comment will be within the acceptable range as long as it is in the general nature of argument, and not an *outright* expression of opinion." *Irick v. United States,* 565 A.2d 26, 36 (D.C.1989).

"Under the circumstances, including the strength of the government's case, we cannot conclude that the judge ... plainly erred." *Finch, supra,* 867 A.2d at 228. The government having argued from the evidence, there is nothing improper about the use of the words "malarkey" or

"garbage." Any dictionary definition of those terms will show just what the prosecutor was suggesting—foolish talk or worthless talk. *See, e.g.,* COLLINS ENGLISH DICTIONARY-COMPLETE & UNABRIDGED (10th ed. 2009); WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE UNABRIDGED (1993); MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY (10th ed. 1993); *see also Soto v. Commonwealth,* 139 S.W.3d 827, 875 (Ky.2004); *State v. Williams,* 133 Ariz. 220, 650 P.2d 1202, 1211–12 (1982). As this Court has put it: "[the prosecutor] is not required to be boring." *See Irick v. United States,* 565 A.2d 26, 37 (D.C.1989). The arguments were made in the context of the overwhelming corroborative evidence in the case and, in all likelihood, had very little effect on the outcome of the trial. The government's attorney was attempting to discredit the appellant's misidentification defense and reinforce Ms. Kuczynska's identification of the appellant by showing that appellant and Scott were physically distinguishable. This was a reasonable inference from the evidence.

### B. § 23–110 Appeal

In an appeal of the denial of his § 23–110 motion without a hearing, appellant asserts that the court incorrectly concluded that appellant's allegations in his § 23–110 motion, even if true, would merit no relief. Specifically, appellant argues that defense counsel was ineffective because counsel failed to pursue Jarwon Scott's alleged admission to the April 11th robbery for presentation at trial and failed to present evidence of appellant's distinctive hand tattoo.

■■■■ "We review the trial court's denial of appellant's D.C.Code § 23–110 motion without a hearing for an abuse of a discretion." *Freeman v. United States,* 971 A.2d 188, 201 (D.C.2009). "To uphold the denial of [appellant's D.C.Code] § 23–110 motion without a hearing, this court must conclude that under no circumstances could [appellant] establish facts warranting relief." *Id.* (alteration in original) (internal quotation marks omitted). "Although a hearing is particularly appropriate when ineffective assistance of counsel is alleged, an evidentiary hearing is not required in every case." *Id.* Specifically, a hearing is not necessary "[w]hen 'the motion and files and records of the case conclusively show that the prisoner is entitled to no relief.'" D.C.Code § 23–110(c); *Freeman, supra,* 971 A.2d at 201. A court may summarily dismiss claims that are (1) vague and conclusory or (2) palpably incredible or (3) that would not merit relief even if true. *Id.* (internal quotation marks omitted).

■■■■ "An appellant alleging the constitutional ineffectiveness of his trial counsel must demonstrate both deficient performance and prejudice in order to merit relief under D.C.Code § 23–110." *Id.* (citing *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Deficient performance requires a showing "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Jones v. United States,* 918 A.2d 389, 402 (D.C.2007) (quoting *Strickland, supra,* 466 U.S. at 687, 104 S.Ct. 2052 (1984)) (internal quotation marks omitted). In assessing counsel's performance we must determine "whether counsel's assistance was reasonable considering all the circumstances." *In re R.E.S.,* 978 A.2d 182, 192 (D.C.2009) (quoting *Strickland, supra,* 466 U.S. at 688, 104 S.Ct. 2052) (internal quotation marks omitted). Appellant must demonstrate prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones,*

*supra*, 918 A.2d at 402 (internal quotation marks omitted). "[J]udicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, [and] ... a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance...." *In re R.E.S., supra*, 978 A.2d at 192 (quoting *Strickland, supra*, 466 U.S. at 689, 104 S.Ct. 2052) (internal quotation marks omitted).

■ Appellant argues that Jarwon Scott's claim of responsibility for the April 11th robbery in an affidavit submitted with the § 23–110 motion, well after the end of the third trial, would have been sufficient to cast doubt on the outcome of the third trial even though the trial judge in the third trial only had access to a different, unsworn letter written by Scott. A careful reading of the two letters demonstrates that appellant's claims, even if true, would have merited no relief. In the unsworn letter Scott stated "[Appellant] did not have anything to do with what *I* did back in April, *which I have taken full responsibility for,* and I am doing so now realizing that I was being selfish thinking about myself in which I have committed the crime and have *accepted* my punishment." We do not know what charges against appellant Scott was aware of for the third trial, and Scott's knowledge is relevant because appellant and Scott were tried for many of the same April crimes during appellant's first trial. Coupled with Scott's usage of the past tense form of "accept" while describing his acceptance of his punishment for the April 17th crimes (for which he pled guilty), the most natural reading of the unsworn letter is Scott tak-

ing responsibility for the April 17th crimes and not appellant's April 11th crime. Scott submitted a sworn affidavit after the third trial was completed, but before the trial court heard the § 23–110 motion, in which he implicated himself and absolved appellant of the April 11th crime. Yet, since appellant could not have used Scott's subsequent affidavit *during* the third trial, Scott's unsworn, vague letter, which was submitted before the third trial could not have changed the outcome of the trial. Moreover, because Scott's attorney prevented appellant's attorney from interviewing Scott at all during the trial, appellant cannot demonstrate prejudice by showing "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Jones, supra*, 918 A.2d at 402 (internal quotation marks omitted).[17]

■ Appellant also argues that counsel was ineffective for failing to present evidence of appellant's hand tattoo at trial in order to undermine Ms. Kuczynska's failure to mention the tattoo in her eyewitness identification. Appellant adds that a number of correction officers could have testified that appellant had the hand tattoo prior to the robbery. Considering all the circumstances, including, *inter alia,* the limited probative value of the hand tattoo, the uncertainty as to the victim's memory with respect to the tattoo, and the potential prejudice to appellant of the testimony of former law enforcement officials, counsel's performance was neither deficient nor prejudicial to appellant. Thus, "[b]ecause the allegations contained in appellant's motion can fairly be characterized as falling into the[ ] [three] categories [providing for the denial of a § 23–110 motion without a

17. Appellant also fails to demonstrate prejudice because even if Scott had taken the stand, the prosecutor could have impeached Scott with prior statements made by Scott incriminating appellant.

hearing], we find no error by the trial judge in denying the motion without a hearing." *Freeman, supra,* 971 A.2d at 201.

Accordingly, appellant's convictions are affirmed and the order denying the collateral attack without a hearing is affirmed.

*So ordered.*

GLICKMAN, Associate Judge, concurring in the result:

My colleagues ultimately conclude that the trial court's exclusion of appellant's proffered expert testimony on eyewitness identification was harmless in view of the strong corroborative evidence of appellant's guilt. I do not take issue with that conclusion. However, in what could be viewed as extended dicta, my colleagues assert it was not error for the trial court to exclude the expert testimony based on the anticipated strength of the government's evidence, rather than on the particularized inquiry required by our decisions in *Dyas v. United States*[1] and *Benn v. United States (Benn II)*.[2] I write separately to express my disagreement with that assertion. In my view, fundamental principles of the law of evidence make it clear that the strength of the government's evidence of appellant's guilt was not a proper factor for the trial court to consider. Moreover, a rule of evidence allowing the trial court to exclude a criminal defendant's expert witness because of the perceived strength of the prosecution's evidence would be unconstitutional, for it would constitute an arbitrary infringement on the defendant's right to a meaningful opportunity to present a complete defense.

Appellant's defense at trial was misidentification—he claimed that Ms. Kuczynska was mistaken in identifying him as the unknown person who robbed her at gunpoint. In support of that claim, appellant called Monica Barnes to the witness stand. She testified that it was Jarwon Scott, not appellant, who gave her Ms. Kuczynska's cell phone and checkbook after the robbery. In further support of his misidentification defense, appellant sought to call Dr. Henry Shulman, a psychologist. According to appellant's proffer, Dr. Shulman could have testified as an expert on factors present in this case that had been shown in controlled scientific experiments to reduce the accuracy of eyewitness identifications of strangers. These factors included the cross-racial nature of the identification,[3] the brevity of Ms. Kuczynska's interaction with her assailant, and the stress and emotional arousal she experienced during the armed robbery. Dr. Shulman would have identified and discussed these factors and the science behind them without offering any opinion of his own on the ultimate question of whether Ms. Kuczynska's identification of appellant was reliable. Appellant argued that the information provided by Dr. Shulman would assist the jury in deciding for itself how much weight to give Ms. Kuczynska's identification testimony.

Prior to the start of appellant's first trial, the trial judge excluded Dr. Shulman's testimony. In other cases, the judge acknowledged, he had found Dr. Shulman's expert testimony on cross-racial identifications to be helpful to the jury and admitted it.[4] But as the judge explained,

1. 376 A.2d 827, 832 (D.C.1977).

2. 978 A.2d 1257, 1269–70, 1273–74 (D.C. 2009).

3. According to appellant's proffer, Dr. Shulman would have testified that "[e]yewitnesses are less likely to be accurate in identifying people of a different ethnicity than they are in identifying people of their own ethnicity."

4. The judge considered the rest of Dr. Shulman's proffered expert testimony unnecessary, believing that the standard jury instruc-

there was little evidence corroborating the identifications in those cases. The judge understood appellant's case to be different, in that the government expected to present "abundant corroborative evidence" of Ms. Kuczynska's identification of appellant. Relying on the government's proffer, the judge cited appellant's attempt to pass one of Ms. Kuczynska's stolen checks, the discovery of the robbery proceeds in a motel room associated with appellant, and his presence in a vehicle linked to the charged robberies. Given such corroboration, the judge concluded, Dr. Shulman's expert testimony "would [not] be of any assistance to the trier of fact" in assessing the reliability of Ms. Kuczynska's identification. Rather, the judge stated, "on these facts" the jury would likely "give undue weight to [Dr. Shulman's] opinion in the narrow area of cross-racial identification," and the probative value of the testimony would be outweighed by the danger of unfair prejudice.

The logic of the judge's ruling is not entirely clear. It appears the judge reasoned that if Ms. Kuczynska's identification of appellant was corroborated by the proffered circumstantial evidence of appellant's guilt, a sensible jury could not find the identification unreliable for the reasons Dr. Shulman would have identified. But it is difficult to see how that conclusion follows, inasmuch as the corroborative evidence did not invalidate Dr. Shulman's proffered testimony or render it irrelevant to the facts of this case. The corroborative evidence certainly was not conclusive, and the judge could not know whether the defense would succeed in weakening it at trial, or what weight the jury would give to

it. It is equally difficult to understand the judge's conclusion that because the circumstantial evidence corroborated Ms. Kuczynska's identification, the probative value of the expert testimony would be outweighed by the danger of unfair prejudice. As used in this context, the term "unfair prejudice" is understood to "mean[ ] an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." [5] No such danger was identified in this case. Nor did the judge explain why he feared the jury would give "undue weight" to Dr. Shulman's testimony. It is the jury's prerogative to weigh the admissible evidence as it sees fit. (If anything, though, one would think the impact of defense evidence would be greatest when the government's case is weak, not when it is strong.) In sum, from all appearances, the judge prejudged the strength of the prosecution's evidence and excluded the defense expert only because he believed the government's evidence *in toto* would be too powerful for the expert testimony by itself to rebut.

Whatever the judge's precise rationale, I think he exercised his discretion erroneously in relying on the fact that Ms. Kuczynska's identification was corroborated by circumstantial evidence to exclude Dr. Shulman's testimony. The ruling runs counter to basic principles of the law of evidence. The judge did not find, nor could he have found, that Dr. Shulman's testimony was irrelevant. In general, if evidence is relevant, it should be admitted unless it is barred by some other legal

tion on identification provides the jury "with all the guidance it needs to be able to determine the accuracy and reliability of eyewitness identification." As discussed below, this categorical rejection of the expert testimony is at odds with our subsequent decision in *Benn II*.

5. *Mercer v. United States,* 724 A.2d 1176, 1184 (D.C.1999) (internal quotation marks omitted).

rule.[6] "There are two components to relevant evidence: materiality and probative value."[7] "[T]he fact sought to be established by the evidence must be material, which is to say that the party must establish that fact as a condition to prevailing on the merits of his case."[8] And the evidence must have probative value, meaning "the tendency of evidence to establish the proposition that it is offered to prove."[9] The probativity threshold for purposes of admissibility is low: An item of evidence, to be relevant, need only "tend[ ] to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence."[10] As Professor McCormick explains:

An item of evidence, being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered. It need not even make that proposition appear more probable than not. Whether the entire body of one party's evidence is sufficient to go to the jury is one question. Whether a particular item of evidence is relevant to the case is quite another. It is enough if the item could reasonably show that a fact is slightly more probable than it would appear without that evidence. Even after the probative force of the evidence is spent, the proposition for which it is offered still can seem quite improbable.[11]

"Ordinarily," therefore, "any evidence which is logically probative of some fact in issue is admissible[,] and if the evidence offered conduces in any reasonable degree to establish the probability or improbability of a fact in controversy, it should go to the jury."[12] Thus, evidence may not be rejected as irrelevant merely because it is contradicted by other evidence. "This is an inappropriate basis to exclude evidence,

6. *See, e.g., Reavis v. United States,* 395 A.2d 75, 78 (D.C.1978) ("Relevance, and the concepts it embodies, determines initially whether a proffered item of evidence will be admissible."); 2 CLIFFORD S. FISHMAN, JONES ON EVIDENCE § 11:1 at 258 (7th ed. 2000) ("Evidence that is relevant should be admitted, unless barred by some other rule."); 1 KENNETH S. BROUN ET AL., MCCORMICK ON EVIDENCE § 184 at 728 (6th ed. 2006) ("[U]nless there is some such distinct ground for refusing to hear the evidence, it should be received.") (footnote omitted); FED.R.EVID. 402 ("Relevant evidence is admissible unless any of the following provides otherwise: the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court. Evidence which is not relevant is not admissible.").

7. MCCORMICK ON EVIDENCE § 185 at 729 (footnote omitted).

8. *Reavis,* 395 A.2d at 78; *see also* MCCORMICK ON EVIDENCE § 185 at 729 ("[Materiality] looks to the relation between the propositions that the evidence is offered to prove and the issues in the case.").

9. *Id.* § 185 at 730.

10. *Punch v. United States,* 377 A.2d 1353, 1358 (D.C.1977); *accord Plummer v. United States,* 813 A.2d 182, 188 (D.C.2002) ("Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.' ") (quoting *Street v. United States,* 602 A.2d 141, 143 (D.C.1992)); FED.R.EVID. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

11. MCCORMICK ON EVIDENCE § 185 at 733 (footnotes omitted). *See, e.g., Winfield v. United States,* 676 A.2d 1, 4 (D.C.1996) (en banc) (holding that when the defendant seeks to introduce evidence of a third-party perpetrator, "there is no requirement that the proffered evidence must prove or even raise a strong probability that someone other than the defendant committed the offense") (internal quotation marks and alterations omitted).

12. *Plummer,* 813 A.2d at 188–89 (internal quotation marks and brackets omitted).

because it preempts the jury's role as fact-finder." [13]

Furthermore, this Court has recognized that "[p]robative evidence should not be excluded because of 'crabbed notions of relevance or excessive mistrust of juries,' " [14] and we have embraced "the policy of admitting as much relevant evidence as it is reasonable and fair to include." [15] Accordingly, we have chosen to follow the federal rule that relevant and otherwise admissible evidence may be excluded only "if its probative value is *substantially* outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." [16]

I see no reason why the foregoing principles should not apply with equal force to the admission of relevant expert testimony. The standard of relevance is the same for expert testimony as it is for other evidence; as we have held, "there is only one standard of relevance." [17] And in *Benn II* we endorsed the principle that "judges should rely on the adversary system, rather than on the exclusion of evidence, to guard against potential juror confusion from the presentation of scientific evidence." [18] We added that "[a]ny remaining concern a trial judge may have that admission of expert testimony could confuse or overwhelm the jury is more appropriately dealt with, not by exclusion, but by placing reasonable limitations on the expert's testimony and instructing the jurors that they—and only they—are the ultimate fact finders." [19]

It is true that "[i]n a jury trial the judge must exercise discretion to decide whether the proffered expert testimony is likely to assist the jury in the performance of its duties—that is to say, in understanding the evidence, determining the facts that must be found and rendering its verdict." [20] But such helpfulness to the jury is determined by the three criteria governing the admissibility of expert opinion testimony set forth in *Dyas*,[21] and ultimately turns on "the relevance and probative val-

---

13. JONES ON EVIDENCE § 11:8 at 281–82 (footnote omitted). Evidence is irrelevant in the sense that it lacks probative value only if "the evidence does not justify *any* reasonable inference as to the fact in question. Cases involving such evidence are few and far between." McCORMICK ON EVIDENCE § 185 at 735 (emphasis in original; footnote omitted).

14. *Allen v. United States*, 603 A.2d 1219, 1224 (D.C.1992) (en banc) (quoting *Riordan v. Kempiners*, 831 F.2d 690, 698 (7th Cir.1987)).

15. *(William A.) Johnson v. United States*, 683 A.2d 1087, 1100 (D.C.1996) (en banc).

16. FED.R.EVID 403 (emphasis added); *see (William A.) Johnson*, 683 A.2d at 1099 ("The 'substantially outweighs' approach is apparently the product of the general federal policy promoting the admission of as much relevant evidence as reasonably possible.").

17. *Winfield*, 676 A.2d at 3.

18. *Benn II*, 978 A.2d at 1275.

19. *Id.*

20. *Hager v. United States*, 856 A.2d 1143, 1147 (D.C.2004) (quoting *Steele v. D.C. Tiger Market*, 854 A.2d 175, 181 (D.C.2004)) (internal quotation marks omitted), *amended by* 861 A.2d 601 (D.C.2004).

21. The three criteria of admissibility set forth in *Dyas* that a judge must consider are: (1) whether the subject matter of the testimony is "beyond the ken of the average layman"; (2) whether the witness is sufficiently qualified as to make it appear that her expertise will "probably aid" the trier of fact; and (3) whether the state of the pertinent art or scientific knowledge permits a reasonable opinion to be asserted. 376 A.2d at 832. My colleagues concede that "the *Dyas* test does not include corroboration." *Ante* at 238.

ue of the proposed scientific evidence."[22] This seems to me to mean that the criterion of helpfulness is met if the expert testimony is relevant and if its probative value is not substantially outweighed by the danger of unfair prejudice or other legitimate concerns. It would be anomalous to interpret the criterion of helpfulness to allow the judge to exclude relevant and otherwise admissible expert testimony merely because the judge is convinced by the strength of the opposing party's evidence and therefore believes the expert's testimony is unconvincing. Such concerns go to the weight of the expert testimony, which is "exclusively for the jury" to determine,[23] not to its admissibility. As Judge Posner has explained (addressing a trial judge's erroneous exclusion of expert opinion testimony), "a judge in our system does not have the right to prevent evidence from getting to the jury merely because he does not think it deserves to be given much weight. He may comment to the jury on the weight of the evidence (though few federal judges do that nowadays), and he may have to balance weight against prejudice in ruling on objections under Fed.R.Evid. 403, but he may not screen witnesses simply to decide whether their testimony is persuasive."[24]

In taking the opposing view, my colleagues rely on cases in which we have said that where corroboration of a challenged identification exists, the exclusion of proffered expert testimony on eyewitness identification generally does not constitute an abuse of discretion.[25] But that does not mean the existence of corroboration is a legitimate reason for the *trial court* to exclude the expert testimony; it only means that the exclusion likely will not be so prejudicial as to necessitate reversal by the *appellate court*. Abuse of discretion is a standard of appellate review incorporating an assessment of prejudice. A trial court exercises its discretion erroneously when it relies on an improper factor,[26] but "the reviewing court must weigh the severity of the error against the importance of the determination in the whole proceeding and the possibility for prejudice as a result."[27] It is only when the impact of the error is so serious we must reverse that we say the trial court "abused" its discretion.[28] I readily grant that where a challenged identification is corroborated, the appellate court may be able to conclude that the erroneous exclusion of expert testimony on eyewitness identification was harmless, and hence that there was no "abuse" of discretion. That is what we conclude in this case.[29] But to

---

**22.** *Benn II*, 978 A.2d at 1278.

**23.** *Jenkins v. United States*, 113 U.S.App.D.C. 300, 309, 307 F.2d 637, 646 (1962).

**24.** *Western Indus., Inc. v. Newcor Can., Ltd.*, 739 F.2d 1198, 1202 (7th Cir.1984) (internal citation omitted). Thus, I believe my colleagues are quite mistaken in giving trial judges a green light to reject relevant expert testimony as unhelpful based on their own "[l]ife experiences." *Ante* at 238 ("Life experiences are sufficient and a trial judge must be vested with discretion to sort out the various situations where experts may illuminate the question."). Such *carte blanche* invites subjective adjudication in the guise of "discretion" and disregards fundamental principles of our jurisprudence limiting the role of

judges in jury trials, not to mention the teachings of *Benn II*, *Dyas*, and myriad other cases, concerning the standards for determining the admissibility of expert testimony.

**25.** *Ante* at 237–38 n. 13 (citing *Benn II*, 978 A.2d at 1280, and *Hager*, 856 A.2d at 1149).

**26.** *(James W.) Johnson v. United States*, 398 A.2d 354, 365 (D.C.1979).

**27.** *Id.* at 367.

**28.** *Id.*

**29.** *See also Heath v. United States*, 26 A.3d 266, 282–85 (D.C.2011) (holding erroneous exclusion of expert testimony to have been harmless).

say the trial court did not *abuse* its discretion is not to say the court exercised its discretion properly.[30]

Furthermore, at least in criminal cases, a rule of evidence permitting the trial judge to bar a defendant from introducing relevant and otherwise admissible expert testimony merely because the judge perceives the prosecution's proffered opposing evidence to be strong would raise a serious constitutional question. As the Supreme Court made clear in *Holmes v. South Carolina*,[31] such a rule likely would violate the defendant's constitutional right to a meaningful opportunity to present a complete defense.

*Holmes* considered a South Carolina rule of evidence under which the defendant was barred from introducing proof of third-party guilt if the prosecution had forensic evidence (e.g., DNA testing) that, if believed, strongly proved the defendant's guilt. Under this rule, the Supreme Court noted, the trial judge did not "focus on the probative value or the potential adverse effects of admitting the defense evidence," and did not assess the strength of the prosecution's evidence in light of the defendant's challenges to its reliability.[32]

With those features, the Court found, the South Carolina evidentiary rule was an arbitrary infringement on the defendant's right to have a meaningful opportunity to present a complete defense. As the Court explained:

> Just because the prosecution's evidence, *if credited,* would provide strong support for a guilty verdict, it does not follow that evidence of third-party guilt has only a weak logical connection to the central issues in the case. And where the credibility of the prosecution's witnesses or the reliability of the evidence is not conceded, the strength of the prosecution's case cannot be assessed without making the sort of factual findings that have traditionally been reserved for the trier of fact and that the South Carolina courts did not purport to make in this case.
>
> The rule applied in this case is no more logical than its converse would be, *i.e.*, a rule barring the prosecution from introducing evidence of a defendant's guilt if the defendant is able to proffer, at a pretrial hearing, evidence that, if believed, strongly supports a verdict of not guilty. . . .
>
> The point is that, by evaluating the strength of only one party's evidence, no logical conclusion can be reached regarding the strength of contrary evidence offered by the other side to rebut or cast doubt.[33]

As is demonstrated in the present case, a rule allowing the trial judge to exclude the defendant's expert testimony on eye-

---

**30.** My colleagues also assert that the corroborative evidence "hardly left the verity of [Ms. Kuczynska's] identification of appellant as the actual robber beyond the ken of the jury." *Ante* at 239. But this is a *non sequitur.* The fact that the identification was corroborated is irrelevant to the pertinent question, which is whether the scientific subject matter of Dr. Shulman's testimony was beyond the ken of the average layperson (the first *Dyas* criterion). On that question, the trial judge made no inquiry or ruling. However, as we explained in *Benn II*, even though "jurors may be familiar from their own experience with factors relevant to the reliability of eyewitness observation and identification, . . . it cannot be said that psychological studies regarding the accuracy of an identification are within the ken of the typical juror." 978 A.2d at 1277 (internal quotation marks omitted).

**31.** 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

**32.** *Id.* at 329, 126 S.Ct. 1727.

**33.** *Id.* at 330–31, 126 S.Ct. 1727.

witness identification if the prosecution proffers strong corroboration of the defendant's guilt is analogous to, and suffers from the same fatal flaws as, the South Carolina rule held unconstitutional in *Holmes.* The judge in this case did not appraise the probative value or potential adverse effects of Dr. Shulman's testimony, nor did he assess the prosecution's evidence in light of the defendant's challenges to its reliability. By evaluating only the prosecution's proffered evidence, the judge could reach no logical conclusion regarding the strength of the expert testimony offered by appellant to rebut or cast doubt on the government's case. And if the judge had attempted to weigh all the evidence in order to determine the question of admissibility, he would have exceeded his mandate and invaded the role of the jury as trier of fact.

Thus, I think the trial judge in the present case erred in concluding that the existence of circumstantial evidence corroborating Ms. Kuczynska's identification of appellant justified excluding Dr. Shulman's expert testimony. As proffered, that testimony would have been relevant, i.e., material and probative, because it would have tended to make Ms. Kuczynska's identification of appellant less probable.[34] The proffer sufficed to oblige the judge to conduct a particularized inquiry and evaluate the expert testimony under the criteria for admissibility set forth in *Dyas.*[35] Without a proper inquiry, as we explained in *Benn II,* it was error to reject any of the proffered testimony as unnecessary.[36]

**34.** This is not a case where testimony regarding the reliability of stranger identifications would have been beside the point because the victim knew the perpetrator she identified or because her identification was not in dispute. *Cf. Heath,* 26 A.3d at 282 ("[T]his expert testimony would have been of scant relevance to the identifications of appellant by Ms. Ervin and Ms. Carter, whatever the reliability of those identifications, because they already knew appellant at the time of the shooting."); *Hager v. United States,* 856 A.2d 1143, 1148–49 (D.C.2004) (expert testimony unhelpful where the "studies on which [the expert] would have relied concern[ed] the reliability of a stranger identification, not an identifica-tion of a person known to the witness, as in this case").

**35.** See footnote 21, *supra.*

**36.** *See Benn II,* 978 A.2d at 1275 ("[E]ven if the trial court did not apply an automatic rule of exclusion, the ruling was nonetheless defective because it did not address the correct legal factors set out in *Dyas* or apply them to the expert testimony that the defense proffered."); *see also id.* at 1278. Thus, the judge also erred in ruling (see footnote 4, *supra*) that the standard jury instruction on identification obviated the need for much of Dr. Shulman's testimony.