*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 10-CF-1466

JEREMIAH GRAY, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF3-4556-10)

(Hon. Ann O'Regan Keary, Trial Judge)

(Argued May 15, 2013                    Decided November 7, 2013)

*Shilpa S. Satoskar*, Public Defender Service, with whom *James Klein* and *Samia Fam*, Public Defender Service, were on the brief, for appellant.

*John P. Gidez*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney, and *Elizabeth Trosman*, *Elizabeth H. Danello*, and *Emily Miller*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER and THOMPSON, *Associate Judges*, and WAGNER, *Senior Judge*.

Opinion for the court by *Associate Judge* THOMPSON.

Opinion by *Senior Judge* WAGNER, concurring in part and dissenting in part, at page 34.

THOMPSON, *Associate Judge*: A jury found appellant Jeremiah Gray guilty of two counts of armed robbery and two counts of possession of a firearm during a crime of violence ("PFCV"). On appeal, appellant contends that the trial court (1) abused its discretion when it precluded him from presenting expert testimony about factors that affect the reliability of eyewitness identifications, and (2) abused its discretion in responding to a juror note about aiding and abetting liability by doing no more than re-reading in their entirety the aiding and abetting instructions the jury had already heard (and inviting the jury to send another, more specific note if it had additional questions). Although we appreciate that the court chose to respond to the juror note in this way to avoid intruding into the jury's deliberations, we are persuaded that the response was not adequate to dispel the confusion the juror note revealed. Because we are unable to conclude beyond a reasonable doubt that the inadequate response was harmless, we reverse.

**I.**

At trial, the government presented evidence that on March 14, 2010, around 3:00 a.m., Kevin Stevenson and Jonathan Gardner were leaving a nightclub and were en route to Stevenson's car, which Stevenson had parked near 14th and S

Streets, N.W. After Stevenson got into the car, and as Gardner was reaching to open the passenger-side door, two men wearing hoods approached Gardner with their guns drawn. Gardner testified that the two men robbed him of his cell phone, driver's license, keys, ring, earrings, necklace, and a pendant. One of the robbers hit Gardner in the face with a gun, causing severe facial and dental injuries.[1] An unidentified third man approached Stevenson's car door and robbed Stevenson at gunpoint of several items (his wallet, cell phone, identification, and bank cards). Stevenson testified that all three robbers had silver handguns.

Just after the robbers fled, Stevenson flagged down Metropolitan Police Department ("MPD") Officer John Terry. Officer Terry testified that Stevenson told him that "three black males in black jackets [who] all had handguns" had just robbed him, and that the robbers were running south on 14th Street.[2] Driving in his police cruiser, Officer Terry canvassed the area looking for suspects. "[A]round 40 to 45 seconds" later, near the corner of 14th and R Streets, N.W.,

---

[1] Gardner's two front teeth were cracked, and Stevenson could "actually see a little bit of the bone coming out of his nose almost."

[2] Officer Terry testified that he had no description of the height, weight, build, age, complexion, or hairstyle of the assailants before he stopped appellant and Tate. On days after the robbery, Stevenson and Gardner gave police additional descriptors, but the defense emphasized that this was after the two victims had discussed with each other which individual they had "picked at the police lineup."

about a "block and a quarter" from where Stevenson had flagged him down, Officer Terry saw appellant and Frank Tate, who matched the description Stevenson had given.[3] When Officer Terry activated his police lights, appellant and Tate "looked back . . . and started running." Officer Terry followed them and, about 15 seconds after initially seeing them (and after briefly losing sight of them), caught up with them outside a house at 1432½ Q Street. Tate was standing at the top of the steps to the house, holding his hand in a fist as if he were knocking on the door. (The resident of the house testified at trial, however, that he did not know Tate or appellant and was not expecting anyone that night.) Appellant was standing at the base of the steps. Both Tate and appellant were wearing "puffy black coat[s]." Officer Terry conducted a pat-down search of both men for weapons (but found none), and then handcuffed and detained them for a show-up identification procedure.

---

[3] Officer Terry testified that he saw no one else on the street. It had been raining heavily, and it was still raining as Stevenson and Gardner walked to their car and when officers canvassed the area looking for proceeds of the robbery.

At the time of the show-up procedure, Gardner "was bleeding profusely and appeared to be in a lot of pain" and was "very upset."[4]  Seated in separate police vehicles, Stevenson and Gardner both positively identified appellant and Tate as the persons who committed the robbery.  Stevenson testified that on a scale of 1 to 10, he was "a 10 being sure" of his identification that night.  Police searched the area, but recovered no guns or proceeds of the robbery.  Later, at the police station, the officers searched appellant and Tate.  Nothing was recovered from appellant, but officers found in Tate's possession Gardner's keys, driver's license, chain, and pendant.[5]  Clinton Hall, an MPD fingerprint specialist, testified that he reviewed several latent prints lifted from Stevenson's car and that none of the usable prints matched either appellant's or Tate's fingerprints.

---

[4]  Gardner acknowledged that he was "dizzy" after the incident and so "shaken up" by it that, for a second, he did not remember "where he stayed."  He also acknowledged that he had been drinking prior to the robbery and was a little "buzzed" when it occurred.  He identified appellant in court (saying that appellant "was there"), but testified that at the time of the show-up identification, he was focused on getting medical help and did not know whether he was shown one or two people during the identification procedure.  He testified that he made his identification(s) during the show-up procedure because he "got a jolt, like, that's him" and based on "gut feeling.  I mean, I've seen his face, clothes.  I mean, you know when somebody just did something to you."

[5]  Police also recovered from Tate's cell phone a photo, taken on the day of the robbery, of Tate holding a silver handgun.

On March 31, 2010, approximately two weeks after the robbery, Stevenson and Gardner attended a line-up at police headquarters that included an individual who police suspected was the third robber (as well as five police officers serving as "fillers"). Neither Gardner nor Stevenson identified that suspect as the robber; instead, both selected an MPD officer who stood in the line-up as number 14. Stevenson, who testified that he thought number 14 was one of the individuals he had identified during the show-up identification conducted on the night of the robbery, said that on a scale of 1 to 10, he was "a 9 as to the certainty of the identification [he] made." Gardner told the prosecutor that he was "sure that . . . number 14 is one of the persons who robbed me." He explained at trial that during most of the robbery, which lasted about two or three minutes, he was down on his knees, facing forward, not looking "in anybody's face." Stevenson explained that he "couldn't really look at" the robber who had the gun in his face because he "didn't want to turn around and be looking down the barrel of a gun."

Before trial, appellant, whose defense theory was mistaken identification, had notified the government of his intent to call Dr. Steven Penrod as an expert witness to testify about several factors adversely affecting the reliability of eyewitness identifications, including (as relevant to appellant's arguments on appeal) the effects of "high stress or fear" and "the presence of a weapon during

the commission of a crime" ("weapon focus") and the correlation between an eyewitness's expressed confidence in an identification and the accuracy of the identification. The trial court held a lengthy hearing on the expert-testimony issue. Concluding that the proffered testimony would not address matters beyond the ken of the jury and would not aid the jury, the court granted the government's motion to exclude Dr. Penrod's testimony.

As part of its instructions to the jury following the parties' closing arguments, the court included an aiding and abetting instruction. The jury was given a written copy of the instructions when it retired to deliberate. During the jury's deliberations, one of the jurors (not the foreperson) sent a note asking, "[f]or someone to be found guilty of aiding and abetting an armed robbery and possession of a firearm during a crime of violence or dangerous crime, do they have to have participated at the time of the crime, or could they have participated after the crime occurred?" After a discussion with counsel, and over defense counsel's objection, the court responded to the note by rereading the aiding and abetting instruction it had given before the jury retired to deliberate and advising the jury that if it had additional questions, it should "go back and attempt to specify a little bit more particularly what you're asking."

Shortly after receiving the court's response to a second jury note (described *infra*), the jury returned its verdicts convicting appellants of two counts of armed robbery and two counts of PFCV. Before sentencing,[6] appellant filed a motion for a new trial on the basis of newly discovered information, *viz.* a statement by Tate (who had pled guilty before trial) that appellant was not involved in the robbery.[7] During the proceeding at which the trial court considered (and denied[8]) that motion, appellant's trial counsel told the court that the jury had "in essence rejected the identifications of . . . Mr. Gardner and Mr. Stevenson when they started asking questions by way of [the first] jury note." Counsel argued that the jury "had seen beyond the identifications and they had acknowledged that the

---

[6] The court sentenced appellant to a total of 132 months' imprisonment.

[7] Attached to the new-trial motion was a letter from Tate stating that he committed the offenses with two other individuals ("Jamal Bell and his friend P.J.") and then ran into appellant on R Street after the incident occurred, but that his counsel earlier had not permitted him to speak to appellant's counsel about the matter. In opposing the new-trial motion, the government pointed out discrepancy between the account Tate offered in his letter and the account he gave during his plea proceeding and in connection with a Youth Rehabilitation Act study and a pre-sentence report, and the discrepancy between Tate's explanation in his letter about where he ran into appellant and appellant's statement to a detective regarding the same.

[8] The trial court denied the motion on the grounds that the "conspicuous absence of [Tate's] offering that information and then his voluntarily coming forth for the first time in a letter after Mr. Gray is convicted . . . will have no weight with the jury" and that "jurors would reasonably look at Mr. Tate . . . as having nothing to lose by falsely exonerating Mr. Gray."

identifications were not reliable and in essence chose not to rely on the identifications. . . . [T]hey went on to ask well, if Mr. Gray is not involved in the actual robbery could he still be convicted of these offenses under a theory of aiding and abetting if he acted after the fact."

## II.

Appellant argues that he is entitled to reversal of his convictions on the grounds that the trial court (1) abused its discretion in precluding the testimony by Dr. Penrod and (2) failed to explain to the jury, in response to the first jury note, that aiding and abetting liability cannot be based on a defendant's conduct after a completed crime. We address these arguments in turn.

## III.

When ruling from the bench on the government's motion *in limine* to exclude the proposed expert testimony, the trial court noted that in previous cases it had admitted and heard Dr. Penrod's testimony about factors affecting the reliability of eyewitness identifications. The court acknowledged Dr. Penrod's

qualifications, recognized that expert testimony on the reliability of eyewitness testimony is helpful to the jury in some cases, expressed its understanding that a trial court's decision whether to allow an expert to testify is a discretionary decision that must be made on a case-by-case basis, gave "individualized consideration to the defense's proffer in the context of the facts in this case,"[9] and, applying the *Dyas* factors that govern the admission of expert testimony in this jurisdiction,[10] explained at length its conclusion that Dr. Penrod's testimony should be excluded. Summarized briefly, the court's reasoning was that Dr. Penrod's testimony "should not be admitted because it [would] not assist the jury and [might], in fact, distract them from the more probative evidence, some favoring validity of identification and some undermining identification evidence[,] which counsel will be presenting" (much of which the court had already heard during an August 30-31 hearing on appellant's and Tate's motions to suppress the show-up identifications and statements to police).

The court also remarked that "[t]he fact that people who profess a great degree of confidence aren't necessarily accurate to a correlating degree doesn't

---

[9] *Russell v. United States*, 17 A.3d 581, 588 (D.C. 2011).

[10] *See Dyas v. United States*, 376 A.2d 827, 832 (D.C. 1977).

require scientific testimony in the [c]ourt's judgment." As to Dr. Penrod's proffered testimony about the effect of stress and weapon-focus on the reliability of identifications, the court said that it had "always had some doubts as to whether this was really beyond the [ken] of laypeople, and [had in the past] permitted [expert testimony on these matters] out of an abundance of caution." Finally, the court focused both on the "weight of the Government evidence" that "provide[d] some corroboration to the victims' identification[s]" and on the "robust array of areas of cross-examination" that it knew the defense would pursue to challenge the reliability of the show-up identifications, including the facts that both Stevenson and Gardner confidently but erroneously chose a police officer from the line-up and that Gardner was badly injured at the time he made the show-up identification. The court did not believe that Dr. Penrod had "much that [would] be beyond the k[e]n of the jurors or [would] assist [them] in deciding the evidence in this case."

Well after the trial court's ruling, this court issued its opinion in *Minor v. United States*, 57 A.3d 406 (D.C. 2012), and its amended opinion in *Patterson v. United States*. *See* 56 A.3d 1152 (D.C. 2012) (amending 37 A.3d 230 (D.C. 2012)). These opinions reflect the evolution of this court's jurisprudence regarding the admissibility of expert testimony about factors affecting the reliability of eyewitness identifications of strangers, in the wake of "new developments in

relevant scientific studies and case law concerning eyewitness identification."[11]  In light of *Minor* and *Patterson*, appellant's argument that the trial court erroneously exercised its discretion in excluding all of Dr. Penrod's proffered testimony has some traction.[12]  We conclude, however, for two reasons, that we need not definitively decide whether the trial court erred in excluding the testimony.

---

[11]  *Russell*, 17 A.3d at 586.

[12]  This court concluded in *Minor* that the topics about which the expert in that case would have testified, i.e., the effect of severe stress on eyewitness identifications and the relationship between a witness's confidence and accuracy — two of the topics on which Dr. Penrod's proffered testimony in this case would have focused — are "beyond the ken of the average lay person" and "average juror."  57 A.3d at 414-15, 416 n.5.  *Minor* also held that the scope of the second *Dyas* factor (whether the witness has "sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth," *Dyas*, 376 A.2d at 832 (emphasis and internal quotation marks omitted)), "is narrow and assesses only whether the proffered expert is qualified to give the proposed testimony."  57 A.3d at 416 (brackets and internal quotation marks omitted).  At the same time, we left "for determination on retrial the question whether or not the so-called weapons-focus effect is beyond the ken of the average juror."  *Id.* at 415 n.3.  We also acknowledged that "[o]ur holding does not, of course, preclude a trial court from determining in an appropriate case that particular expert testimony, even if it satisfies all three *Dyas* factors, should be excluded as more prejudicial than probative on the facts of the particular case."  *Id.* at 419 n.6.  *See also Patterson*, 37 A.3d at 248 (Glickman, J., concurring) ("[W]e have chosen to follow the federal rule that relevant and otherwise admissible evidence may be excluded only 'if its probative value is substantially outweighed by a danger of one or more of the following:  unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.'") (concurring opinion withdrawn on other grounds, 56 A.3d at 1155).

(continued…)

First, as described above, during the hearing on appellant's motion for a new trial, appellant's trial counsel contended that the jury note about aiding and abetting liability based on "participat[ion] after the crime occurred" indicated that the jury had "rejected the identifications both of Mr. Gardner and Mr. Stevenson," had seen "beyond the identifications," and had "acknowledged that the identifications were not reliable and in essence chose not to rely on the identifications." We are inclined to agree with trial counsel's assessment, and on that basis are persuaded that the exclusion of Dr. Penrod's testimony, if error, was harmless. The non-expert testimony the jury heard gave them ample reason not to rely on Gardner's and Stevenson's show-up identifications.[13] That non-expert testimony, which appellant's trial counsel particularly emphasized during closing

---

(…continued)

The amended *Patterson* opinion was issued after the Division granted rehearing and agreed, *see* 56 A.3d at 1153, to strike, *inter alia*, a portion of the original opinion that stated, at 37 A.3d at 238, that "[w]hen other evidence points to the verity of a victim's identification of the accused, . . . that evidence is a legitimate consideration for the trial judge in exercising judgment on whether to exclude such expert testimony").

[13] The jury could have relied instead on other evidence to infer that appellant was one of the robbers: the evidence that minutes after the robbery, on a rainy night when no one else was on the street, it was appellant who was spotted with Tate, ran away from police alongside him, and joined in the ruse Tate staged to keep police from apprehending him while he (Tate) was in possession of proceeds of the robbery).

argument, demonstrated concretely the points Dr. Penrod would have made, as it included testimony that both victims incorrectly identified a police officer as the third robber despite their confidence about their identifications; that Gardner was in such distress at the time of the show-up identification that, for a time, he could not even remember where he lived; and that Stevenson was focused on the weapon one of the robbers was pointing at him and thus did not focus on the robbers' faces.

Second, as discussed below, although we think it presents a close question, we are persuaded by appellant's argument that the trial court's response to the jury note did not do enough to answer the question posed in the first jury note. Because we are unable to say beyond a reasonable doubt that appellant sustained no prejudice from the inadequate response to the jury note, we agree with him that he is entitled to reversal of his convictions on that basis (and for that reason, too, we need not resolve whether the trial court erred in excluding Dr. Penrod's testimony).[14]

---

[14] If the matter is re-tried, the trial court will have the opportunity to consider the admissibility of any proffered expert testimony about factors affecting the reliability of eyewitness identifications, and the scope of any expert testimony that may be permitted, in light of *Minor* and *Patterson*. *See Thomas v. United States*, 59 A.3d 1252, 1267 (D.C. 2013).

**IV.**

Appellant argues that the first jury note — asking whether appellant could be found guilty of armed robbery if he participated not at the time of the crime, but after the crime occurred — unambiguously "targeted the factual scenario . . . of [appellant's] participation with his friend, Mr. Tate, during Mr. Tate's post-robbery attempt to evade apprehension[.]" The jury was wondering, appellant contends, whether it could convict appellant of armed robbery on the basis that he "assisted Mr. Tate in an attempted cover up of the crime." Appellant argues that because the court's only response to the jury was a repeat of the instructions the jury had already heard, which "did not specifically address . . . whether assisting someone to avoid apprehension after a crime could be 'aiding and abetting,'" the court did not dispel the jury's (or the one juror's) confusion and allowed the jury to convict appellant on an improper basis.

To explain our analysis of appellant's argument, we begin with a detailed discussion of the jury's notes.

*A. Background*

To recap, the jury's question regarding the aiding and abetting instruction was:

> For someone to be found guilty of aiding and abetting an armed robbery and possession of a firearm during a crime of violence or dangerous crime, do they have to have participated at the time of the crime, or could they have participated after the crime occurred?

After reading the note to counsel, the court observed that it was "sure [the jury] would like a yes or no answer" but that their question did not "lend[] itself well to a yes or no answer." The court suggested that it should respond instead simply by rereading the aiding and abetting instruction in its entirety. The prosecutor agreed, but defense counsel objected to the court's proposal to re-read the entire instruction, asserting that the jury's question did lend itself to a yes or no answer, and that "the answer to the first part of the question is . . . yes" and "the answer to the second part of the question is no." Defense counsel noted that although the government had not charged or presented evidence that appellant's presence with Tate on S Street made him an accessory after the fact or that "a conspiracy [had] tak[en] place," the "plain meaning" of the jury's question was "they're just wondering whether Mr. Gray walking with Mr. Tate in the alley is part of this crime versus . . . the event on S Street, the actual robbery itself" and "whether the walking down the alley itself with Mr. Tate, who has the proceeds of the robbery, is sufficient for them to apply the aiding and abetting instruction."

The court observed that the aiding and abetting instruction was "one of the most complicated instructions" the jury had been given and said that it was "not surprised they're a little confused and that they might need some assistance." The court acknowledged that defense counsel's interpretation "may be the correct speculation as to what is in their mind," but said that the jury's question was "difficult to comprehend" and remarked that it was "hesitant to speculate as to what they're saying exactly." The next day, however, the court observed that the jury's question came down to, "If he did something after, does that count?"[15] The court observed that the jury note "really calls upon us to define what they're talking about — participating in what after the crime occurred?"

The court reasoned that a simple yes or no answer to the question about participating "at the time of the crime" would not be appropriate (since "[t]he instruction itself says any participation in planning or carrying out the crime would qualify as aiding and abetting[]"). The court concluded the discussion with counsel by saying that it would "start" by giving the full aiding and abetting instruction again and inviting the jury to be more specific about what it was asking

---

[15] Although the prosecutor, too, initially expressed the view that the note was difficult to understand, she subsequently agreed that the jury was asking "if someone could be guilty of something after the crime was over."

if it still had a question. If the jury came back with a follow-up question, the court suggested, "maybe we can interpret it as [defense counsel was] proposing." Defense counsel responded, "Understood. Understood."

Thereafter the court re-read the aiding and abetting instruction. The instruction was as follows:

> You may find the defendant guilty of the crimes of armed robbery and possession of a firearm during the commission of a crime of violence or dangerous crime without finding that he personally committed each of the acts that make up the crime or that he was present while the crime was being committed.
>
> Any person who in some way intentionally participates in the commission of a crime can be found guilty either as an aider and abettor or as a principal offender. It makes no difference which label you attach.
>
> The person is as guilty of the crime as he would be if he had personally committed each of the acts that make up the crime.
>
> To find that a defendant aided and abetted in committing a crime, you must find that the defendant knowingly associated himself with the commission of the crime, that he participated in the crime as something he wished to bring about and that he intended by his actions to make it succeed.
>
> Some affirmative conduct by the defendant in planning or carrying out the crime is necessary.

Mere physical presence by the defendant at the place and time the crime is committed is not by itself sufficient to establish his guilt.

However, mere physical presence is enough if it is intended to help the commission of the crime.

The government is not required to prove that anyone discussed or agreed upon a specific time or method of committing the crime.

The government is not required to prove that the crime was committed in the particular way planned or agreed upon.

Nor need the government prove that the principal offender and the person alleged to be the aider and abettor directly communicated with each other.

I've already instructed you on the elements of each of the offenses with which the defendant is charged.

And with respect to the charge of armed robbery, regardless of whether a defendant is an aider and abettor or a principal offender, the government must prove beyond a reasonable doubt that the defendant acted with the intent to steal the property.

With respect to the charge of possession of a firearm during the commission of a crime of violence or dangerous crime, regardless of whether a defendant is an aider and abettor or a principal offender, the government must prove beyond a reasonable doubt that the defendant personally acted voluntarily and on purpose, not by mistake or accident.

An aider and abettor is legally responsible for the principal's use of a weapon during an offense if the government proves beyond a reasonable doubt that the

aider and abettor had actual knowledge that some type of weapon would be used to commit the offense.

You may but are not required to infer that the aider and abettor knew that some type of weapon would be used to commit the offense from the surrounding circumstances.

You may consider any statement made, acts done or not done, the reasonable foreseeability that some weapon would be required to commit the offense and any other facts and circumstances received in evidence that indicate the aider and abettor's knowledge or lack of knowledge.

For the defendant to be guilty of aiding and abetting the offense of possession of a firearm during the commission of a crime of violence, the government must prove both that the defendant aided and abetted the commission of the crime of violence or dangerous crime and also that the defendant aided and abetted the possession of a firearm.

There must be some affirmative conduct by the aider and abettor in furtherance of the act of possessing the firearm.

It is not necessary that all the people who committed the crime be caught or identified.

It is sufficient if you find beyond a reasonable doubt that the crime was committed by someone and that the defendant knowingly and intentionally aided and abetted in committing the crime.

After re-reading the foregoing instruction, the court told the jury:

Now, ladies and gentlemen, if you still have an additional question after I've just given you the re-instruction on this, I would ask you to go back and attempt to specify a little bit more particularly what you're asking. But

hopefully that will help you in answering the question in and of itself.

The jury then resumed its deliberations. About 4 ½ hours later, the jury sent a second note. That note, signed by the jury foreperson, posed two questions. The first question referred to the instruction that if the jury found appellant "not guilty of the crimes of violence, [they] must find him not guilty of each of the[] [charged] offenses of [PFCV]." The jury asked, "Is the converse true?" The colloquy between the court and the parties about the second note focused initially on "what converse means in this situation." The prosecutor suggested as her first interpretation that the jury might be asking whether "if we find him not guilty of [PFCV]," "do [we] have to go back and reconsider . . . armed robbery," i.e., "must we find him not guilty of armed robbery."[16] Defense counsel argued that the jury's new question "reveal[ed] that they didn't fully understand . . . the theory of aiding and abetting" and did not understand the court's response to the first note "because the Court didn't provide a direct answer" to that note. Defense counsel urged the court to "seek . . . clarification" from the jury, asserting that the second note was the jury's response to the court's invitation "to come back with a more concrete

---

[16] The prosecutor also commented that the jury's question might mean that they "initially think he's guilty of armed robbery but then not guilty of [PFCV] for whatever reason[.]"

question" if they still needed assistance. The court agreed that "arguably" the second note was "in response to that invitation."

The court thought that when the jury asked whether the converse was true, they seemed to be saying, "[I]f we find him guilty of armed robbery, must we find him guilty of PFCV?" The court said that it would answer (and it went on to tell the jury) that "[i]f you find the defendant guilty of armed robbery, you must then separately determine whether the government has proved that he committed the offense of possession of a firearm during the commission of a crime of violence."

The other question in the second jury note was the following:

> If they [presumably, crimes of violence and PFCV] are severable, what [is meant by] "some affirmative conduct by the aider and abettor in furtherance of the act of possessing the firearm?"

The prosecutor opined that the jury was asking "what is affirmative conduct by an aider and abettor in furtherance of possessing a firearm[?]" The court eventually instructed the jury: "I can't define affirmative conduct for you. It is up to you to

determine whether there is proof of some affirmative conduct in furtherance of the act of possession of the firearm during [a] crime of violence."[17]

About an hour after hearing the court's responses to the second note, the jury returned its guilty verdicts.

*B.   Discussion*

The government presented evidence that appellant was a full participant in the robbery on R Street, wielding a gun. Summarizing the evidence during closing argument, the prosecutor told the jury that it was "clear that [appellant] is one of the people who first came up and pointed a gun at . . . Gardner." The prosecutor added, however, that if the jury found that appellant and Tate "were working together" and that "one of their actions helped the other accomplish the end goal here," they could find appellant guilty of aiding and abetting armed robbery.

The court's subsequent aiding and abetting instructions told the jury that appellant could be guilty of armed robbery without being "present while the crime was being committed." Except in one respect, the government's evidence did not

---

[17] Appellant does not challenge the court's response to this question.

suggest *how* appellant could have had a role in the charged offenses without having been "present while the crime was being committed."[18] That respect was the evidence of what the prosecutor called the "ruse" on Q Street. The prosecutor previewed in her opening statement that when Officer Terry caught up with Tate and appellant, Tate "was in a ruse-like way pretending to knock on the door [of 1432½ Q Street] as if he knew someone that lived there," and appellant "stood there with him" inside the fenced-in yard at the bottom of the three steps that led to the doorway — joining in the "ruse," the prosecutor implied. The prosecutor pursued the same theme more explicitly in closing argument, emphasizing that appellant was not just on the sidewalk or walking by, but was inside the fenced-in yard of the house, "trying to pull off a ruse, trying to make the police not stop, and not talk to them, not find out what Frank Tate might have in his pockets."

In light of this background, we do not think it is speculation to say that the jury's question that focused on "participat[ion] after the crime occurred" (1) "strongly implie[d] they were not eager to credit"[19] the identification evidence that appellant participated in the robbery on R Street and (2) also implied that the jury

---

[18] As appellant's trial counsel pointed out, the government presented no evidence that, and did not argue that, "a conspiracy [had] tak[en] place."

[19] *Euceda v. United States*, 66 A.3d 994, 1009 (D.C. 2013).

(or, at least, the juror who posed the question) wanted to know whether appellant's participation in what the prosecutor had described as the "ruse" in front of 1432½ Q Street met the test of aiding and abetting.

In general, "[t]he decision on what further instructions, if any, to give in response to a jury question lies within the sound discretion of the trial court[,]" *Yelverton v. United States*, 904 A.2d 383, 387 (D.C. 2006) (brackets and internal quotation marks omitted), and "absent abuse of that discretion we will not reverse." *Whitaker v. United States*, 617 A.2d 499, 501 (D.C. 1992) (internal quotation marks omitted). However, "[w]hen the jury explains specific difficulties, the trial court 'should clear them away with concrete accuracy.'" *Alcindore v. United States*, 818 A.2d 152, 155 (D.C. 2003) (quoting *Bollenbach v. United States*, 326 U.S. 607, 612-13 (1946)). Similarly, "[w]hen a jury sends a note which demonstrates that it is confused, the trial court must not allow that confusion to persist[,]" *id.*, but "must make an appropriate and effective response," *Whitaker*, 617 A.2d at 501, dispelling the jury's confusion. "Telling jurors to refer back to their original charge may be appropriate in some circumstances." *Euceda*, 66 A.3d at 1008. But where a jury has indicated its confusion on an important issue, it is "not sufficient for the court to rely on more general statements in its prior charge." *United States v. Nunez*, 889 F.2d 1564, 1568 (6th Cir. 1989) ("A conviction ought

not to rest on an equivocal direction to the jury on a basic issue.") (internal quotation marks omitted).

We appreciate that in this case the trial judge, who recognized that the jury was "a little confused" and wanted to "be as helpful as possible," also wanted to be careful to avoid "potentially intruding on [the jury's] deliberation." Nevertheless, we agree with appellant that, on the facts of this case — including that the jury already had a written copy of the aiding and abetting instructions at the time the first note was sent — simply re-reading the aiding and abetting instructions "did not come close to clearing away the jurors' confusion with concrete accuracy." *Euceda*, 66 A.3d at 1008 (internal quotation marks omitted). It was clear from the jury's first note that the jurors were "trying to find the 'act or acts' that satisfied" the definition of aiding and abetting but "were unsure which acts legally could count[.]" *Id.* at 1009.[20] As the trial court and the parties recognized, if appellant had not been involved in planning or executing the robbery, his participation in the "ruse" constituted only accessory-after-the-fact activity, which did not meet the

---

[20] As described above, the trial court and the prosecutor eventually agreed with appellant that the jury was asking, "If [appellant] did something after, does that count?" and whether appellant "could be guilty of something after the crime was over."

test of aiding and abetting.[21] "A proper response from the court would have made this clear[.]" *Id.* at 1010.[22]

The aiding and abetting instruction did not provide the necessary clarification. The court's instruction on the elements of robbery had told jurors that it was "necessary that the defendant carried away the property after taking it, so as to deprive someone of his possessions" and that "the least removal of the thing from its place can be enough to show carrying away." The aiding and abetting instruction then told jurors that they could find appellant guilty if they found that he "intentionally participate[d] in the commission of a crime," "knowingly associated himself with the commission of the crime," and "participated in the crime as something he wished to bring about and . . . intended

_____

[21] "By definition, an 'aider and abettor' assists or participates in a crime while that crime is in progress." *Carter v. United States*, 957 A.2d 9, 16 (D.C. 2008). "By contrast, once the crime is complete, one who knowingly 'receives, relieves, comforts, or assists the felon in order to hinder the felon's apprehension, trial, or punishment' is an 'accessory after the fact.'" *Id.* at 16-17. "The crime of being an accessory after the fact . . . must be distinctly charged in the indictment." *Williams v. United States*, 478 A.2d 1101, 1106 (D.C. 1984). Mere participation in Tate's ruse might have rendered appellant guilty of acting as an accessory after the fact, but appellant was not charged with that offense.

[22] As in *Euceda*, "the trial court's failure to properly address the jury's questions had implications for" the PFCV charges as well, since those charges depended in part on the jury finding appellant guilty of armed robbery. 66 A.3d at 1010.

by his actions to make it succeed," and also that "mere physical presence is enough if it is intended to help the commission of the crime."[23]  Jurors (all but one of whom, it appears, were lay persons)  could easily have understood (and the one juror's question strongly suggests that he or she contemplated) that these requirements were satisfied if appellant, not having participated in what transpired on R Street and not having been shown to have helped plan the robbery or to have been the designated get-away accomplice, did no more than associate himself with Tate while the latter had (some of) the stolen property, with the intent that Tate succeed in evading police attention and apprehension.

To be sure, the trial court instructed the jury that it was "to consider all of the instructions as a whole" and that it was not to "follow some and ignore others." And, some portions of the aiding and abetting instructions (e.g., the instruction that, to prove appellant guilty of armed robbery, the government "must prove beyond a reasonable doubt that the defendant acted with the intent to steal the property") perhaps could not as easily as others be thought to cover participation in the ruse.  But in light of the other instructions quoted in the paragraph above, we cannot conclude that the court's re-reading of the instructions the jury had already

---

[23]  Recall that the prosecutor had told jurors that they could find appellant guilty of aiding and abetting armed robbery if they found that "one of their actions helped the other accomplish the end goal here[.]"

heard (and had the opportunity to read and re-read for themselves) was effectively designed to dispel the likely misunderstanding. Merely re-reading the instruction provided no guidance about what part of the instruction was relevant to the juror's question.[24] Further, while the court invited the jury to inquire again if they still had questions,[25] with the court having taken the time to re-read the lengthy instruction, "[t]he trepidation and confusion engendered by such a vague response may even have caused the jur[or] to abandon [the] inquiry altogether." *Roberts v. United*

---

[24] The problem here was that "no one clear source for the answers was contained within the trial court's previous instructions." *Euceda*, 66 A.3d at 1008. "At best, the jury may have been able to deduce the answers by assembling various premises scattered through the court's instructions[,]" *id.* at 1009, "but any reinstruction requiring a meandering search by a confused jury is not the concrete, accurate guidance required of trial courts." *Id.*

[25] As recounted above, when the court said that it would give the jury this invitation, defense counsel responded, "Understood. Understood." Even if *arguendo* defense counsel could be said to have agreed to the court's approach of re-reading its initial aiding and abetting instruction, and thus to have waived his initial objection, we think it fair to say that, after the jury sent the second note, counsel renewed his argument that re-reading the instructions was not an adequate response to the first note. He argued that the jury's new inquiry showed that jurors "didn't fully understand . . . the theory of aiding and abetting" because of the court's "non-responsive" answer to the first note and that the second note was the jury's response to the court's invitation "to come back with a more concrete question" if they still needed assistance. For these reasons, we cannot conclude that appellant waived his objection to the court's response to the question posed in the first note. Nor do we agree with the government that the only claim appellant preserved was that the court should have responded to the first note with a "yes" or "no" answer.

*States*, 402 A.2d 441, 443 (D.C. 1979).[26]   As the prosecutor acknowledged, the court had an obligation "to help the jurors along and not simply . . . reread them portions of instructions or whole instructions that they've already had when [it's] not helping."

We are constrained to conclude that the court's response to the first note was not adequate to dispel the jury's confusion and thus was an erroneous exercise of the court's discretion.  The remaining issue is whether we can conclude that the error was harmless.  The parties disagree about which harmlessness standard applies.  Appellant argues that the inadequacy of the court's response was an error of constitutional dimension, requiring us to apply the harmless-beyond-a-reasonable doubt standard articulated in *Chapman v. California*, 386 U.S. 18 (1967).  The government argues that the less-stringent test of *Kotteakos v. United States*, 328 U.S. 750, 765 (1946) applies, i.e., whether we can "say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error."

---

[26]   *See also Preacher v. United States*, 934 A.2d 363, 369 (D.C. 2007) (holding that where "[t]he jury's question was clear, and it was central" to their deliberations, but the court, instead of answering the jury's specific question, "opted to repeat the standard . . . instructions," its failure to provide guidance was error, which was not rectified by the court's invitation to the jury to inquire further if the court had not responded to their questions).

Our resolution of the issue is as follows: The jury's question appeared to ask whether appellant could be convicted solely on the basis of something he did on Q Street after the robbery. Thus, the jury seemed to be asking whether appellant could be convicted even if he was not, as the victims claimed, one of the men who robbed them on R Street. Since appellant's defense was mistaken identity — i.e., that he was not one of the men who robbed the victims on R Street — the jury's question pertained to a controlling issue in the case; it revealed a risk that jurors could accept appellant's defense but still convict him, on an improper basis. "The provision of an answer to a jury note that is adequate to dispel jury confusion on a controlling issue of a case is such an important aspect of due process of law that we [must] be satisfied beyond a reasonable doubt that an omission to provide [such an answer] was harmless before we [can] conclude that it did not vitiate the verdict." *Preacher*, 934 A.2d at 370 (quoting *Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987)). Thus, even though it is in general "well settled that instructional error is subject to harmless error analysis," *Brooks v. United States*, 599 A.2d 1094, 1101 (D.C. 1991), we conclude that the *Chapman* standard applies.

We view this as a close case in which the standard of review makes all the difference. There are, we acknowledge, reasons for thinking that the convictions were *not* based solely on the evidence of appellant's participation in the ruse on Q Street. For example, it is not clear why the jury would have convicted appellant of *armed* robbery if they did not believe he participated in the conduct on R Street, given that one of the court's instructions quoted above told them that appellant was "legally responsible for the . . . use of a weapon during an offense" only if he had "actual knowledge that some type of weapon *would be used* to commit the offense" (italics added). It also is not clear why the jury would have convicted appellant of PFCV if they did not believe that he participated in the conduct on R Street, given that another of the court's instructions quoted above told them that for appellant to be guilty of aiding and abetting the offense of PFCV, he must have committed "some affirmative conduct . . . in furtherance of the act of possessing the firearm" (and given that the police found no firearm on Tate or appellant after they apprehended them on Q Street). We could perhaps say with fair assurance that despite whatever doubt one or more jurors might have harbored initially about whether appellant participated on R Street, the PFCV verdicts show that those doubts were resolved in favor of a finding that he did so.

We have difficulty reaching that conclusion beyond a reasonable doubt, however. We come back to the initial jury note, which posed the question about whether a guilty verdict could be premised solely on "participat[ion] after the crime occurred" with respect to both "armed" robbery and PFCV. The question was posed despite what our paragraph above suggests were instructions that should clearly have precluded a "yes" answer (even if the jury thought appellant was an accessory after the fact to robbery). There is also the fact that the jury asked what was meant by the phrase in the PFCV instruction, "some affirmative conduct by the aider and abettor in furtherance of the act of possessing the firearm[.]" As noted above, the court declined to define the term "affirmative conduct." The fact that the jury expressed uncertainty but received no guidance about that leaves us with doubt about whether the PFCV convictions were premised on a finding that appellant had a role in the events of March 14, 2010, that preceded his conduct on Q Street. In addition, it seems clear that, hours after hearing the court re-read the instructions on aiding and abetting, the jury was struggling to reach its verdicts. As recounted above, the prosecutor suggested that the jury's question in its second note might mean that they thought appellant was guilty of armed robbery "but then not guilty of [PFCV] for whatever reason" and might be wondering whether, if they found appellant not guilty of PFCV, they would need to "go back and reconsider . . . armed robbery" and find appellant "not guilty of armed robbery."

The foregoing points give us pause and are enough to prevent us from concluding beyond a reasonable doubt that the jury did not convict appellant based solely on his participation in the ruse on Q Street. Accordingly, we reverse appellant's convictions.

*So ordered.*

WAGNER, *Senior Judge*, concurring in part, and dissenting in part: I join the opinion for the court insofar as it concludes that the trial court's ruling excluding the expert witness' testimony, if error, was harmless. I respectfully dissent from Part IV of the opinion in which the majority finds that the trial court abused its discretion in responding to the jury's note. In my view, the trial court acted prudently and within its discretion by (1) reinstructing on aiding and abetting and (2) inviting the jury to clarify the note if they still had a question after reinstruction.

Although defense counsel thought otherwise, as the trial court observed, the note did not lend itself to a simple yes or no answer.[1] The jury's question was also subject to more than one interpretation. Appellant's trial counsel offered that the jury might be distinguishing between the robbery on S Street and appellant walking thereafter in the alley with Tate, who had the proceeds of the crime. Slightly varying from that interpretation, appellant suggests on appeal that the jury was focusing on two incidents, the armed robbery committed by three men and post-robbery efforts to evade apprehension when appellant and Tate were arrested on Q Street. Given the different meanings suggested, the trial court had reason to be "hesitant to speculate as to what they're saying." The trial court sought to follow the best course without intruding into their deliberations and given the situation. Where in the context of the case, the jury's note is not clear, the court may seek clarification. *See Potter v. United States*, 534 A.2d 943, 946 (D.C. 1987) (citation omitted) (stating that "where the jury's note is ambiguous, the court is not

---

[1] The note stated:

> For someone to be found guilty of aiding and abetting an armed robbery and possession of a firearm during the commission of a crime of violence or dangerous crime, do they have to have participated at the time of [the] crime, or could they have participated after the crime occurred?

required to answer it without clarification"). Here, the trial court did just that. At the same time, it reinstructed the jury on aiding and abetting, which was at the center of their inquiry. This instruction provided the guidance essential for the jury to determine whether the government had proven appellant's guilt under that theory.[2] At this juncture, there was no need for the trial court to do more to respond adequately to the note. Under these circumstances, I am persuaded that the trial court did not abuse its discretion in responding to the jury's note. *See Alcindor v. United States*, 818 A.2d 152, 155 (D.C. 2003) (citing *Whitaker v. United States*, 617 A.2d 499, 501 (D.C. 1992) (other citation omitted) (setting forth the standard that the trial court's decision on reinstruction in response to a jury note will not be reversed absent an abuse of discretion). Therefore, I would affirm the judgment of the trial court.

---

[2] Although the jury had a copy of the instructions in the jury room, they are quite lengthy. The trial court's decision to refocus them on this relevant instruction, among the many, appeared to be necessary and provided the jury with the means to decide the aiding and abetting issues under the facts that they found.